

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-12-2007

# USA v. Wecht

Precedential or Non-Precedential: Precedential

Docket No. 06-3098

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Wecht" (2007). *2007 Decisions.* Paper 1164.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1164

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 06-3098, 06-3099, 06-3195, 06-3202, 06-3212, 06-3213 &
06-3704

_____

UNITED STATES OF AMERICA,

Appellant in No. 06-3195

v.

CYRIL H. WECHT,

Appellant in No. 06-3098

WPXI, INC.,

Intervenor
Appellant in Nos. 06-3099
and 06-3202

PG PUBLISHING CO. D/B/A THE PITTSBURGH POST-
GAZETTE,

Intervenor
Appellant in Nos. 06-3212
and 06-3213

TRIBUNE-REVIEW PUBLISHING CO., and
HEARST-ARGYLE STATIONS, INC. D/B/A WTAE-TV,

Intervenors.

_____

On Appeal from the United States District Court

No. 06-3704

IN RE: DR. CYRIL H. WECHT

On Petition for Writ of Mandamus
Related to Western District of Pennsylvania
D.C. No. 2:06-cr-00026
District Judge: Honorable Arthur J. Schwab

Argued September 12, 2006
Before: FUENTES, FISHER, and BRIGHT,[*] Circuit Judges.

(Filed: April 12, 2007)

Jerry S. McDevitt (ARGUED)
Richard L. Thornburgh
Mark A. Rush
Amy L. Barrette
J. Nicholas Ranjan
Kirkpatrick & Lockhart Nicholson Graham LLP
535 Smithfield Street
Pittsburgh, PA 15222
*Attorneys for Cyril H. Wecht*

Douglas Letter (ARGUED)
Appellate Litigation Counsel, Civil Division
950 Pennsylvania Avenue, N.W.

_____

[*] Honorable Myron H. Bright, United States Court of
Appeals for the Eighth Circuit, sitting by designation.

Washington, DC 20530
Richard A. Friedman (ARGUED)
Appellate Section, Criminal Division
United States Department of Justice
10th Street & Constitution Avenue, N.W.
Washington, DC 20530
Mary Beth Buchanan
United States Attorney
Peter Keisler
Assistant Attorney General
Robert L. Eberhardt
Assistant United States Attorney
Rebecca Ross Haywood (ARGUED)
Assistant United States Attorney
Stephen S. Stallings (ARGUED)
Office of United States Attorney
700 Grant Street
Suite 400
Pittsburgh, PA 15219
*Attorneys for United States of America*

Walter P. DeForest (ARGUED)
David J. Berardinelli
George Bobb
DeForest Koscelnik Yokitis & Kaplan
3000 Koppers Building
Pittsburgh, PA 15219
*Attorneys for Intervenors WPXI, Inc.*

David J. Bird (ARGUED)
W. Thomas McGough
Joseph F. Rodkey, Jr.
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219
*Attorneys for Intervenors PG Publishing Co. D/B/A the Pittsburgh Post-Gazette*

David A. Strassburger (ARGUED)
Strassburger, McKenna, Gutnick & Potter, P.C.
Four Gateway Center, Suite 2200

3

444 Liberty Avenue
Pittsburgh, PA 15222
*Attorney for Intervenor Tribune-Review Publishing Co.*
*and Hearst-Argyle Stations, Inc. D/B/A WTAE-TV*

---

OPINION OF THE COURT

---

FUENTES, <u>Circuit Judge</u>.

Dr. Cyril Wecht, an acclaimed forensic pathologist, was indicted on January 20, 2006, for the crimes of theft of honest services, mail fraud, wire fraud, and theft from an organization receiving federal funds. The 84-count indictment asserts that he unlawfully used his public office as the coroner of Allegheny County, Pennsylvania, for private financial gain. The government alleges that Dr. Wecht, for example, billed private clients improperly, falsified transportation records, used County employees for work related to his private practice, and provided cadavers to a local college in exchange for laboratory space. Wecht has denied these charges, claiming they are unsupported and politically motivated. His trial was scheduled to begin in October 2006, but we have stayed it pending disposition of three applications that are before us: (1) Wecht's challenge of Local Rule 83.1 of the U.S. District Court for the Western District of Pennsylvania, which limits attorney speech about cases, (2) the government's appeal of the District Court's decision to unseal certain records, and (3) Wecht's petition for an order disqualifying the trial judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

After an FBI investigation led by Special Agent Bradley Orsini, Wecht was indicted on January 20, 2006. Wecht contends that his indictment stemmed from his public feud with Stephen Zappala, the Allegheny County District Attorney. According to Wecht, this feud was "caused by Zappala's failure to investigate or prosecute white policemen who had killed black citizens in deaths

4

ruled a species of homicide by Dr. Wecht." Wecht Br. at 7. Wecht claims that in order to end their public debate, Zappala prompted an FBI investigation into Wecht's activities. As part of this investigation, Orsini signed affidavits in April 2005 for three search warrants, the execution of which were covered by local television stations and newspapers.

Wecht asserts that his indictment was "drafted as much for media attention as legal merit," and that the U.S. Attorney "personally contributed to the extensive media exposure by calling a highly unusual press conference which was widely attended by the media." Id. at 11-12. Wecht claims the U.S. Attorney's comments "demonize[d]" him and "portrayed [him] as a craven bodysnatcher." Id. at 13-14.

Soon after the indictment, Wecht and the government worked on a proposed Pretrial Order, which they discussed with the Court at two status conferences. On March 1, 2006, the District Court adopted the final proposed Pretrial Order without objection from either party.[1] The Pretrial Order contained various provisions relevant to the matters presently before us. Section 9 of the Pretrial Order incorporated Western District of Pennsylvania Local Rule 83.1. The Rule is entitled "Free Press—Fair Trial Provisions" and limits what attorneys can say about ongoing criminal cases. Specifically, attorneys may not release information that "a reasonable person would expect to be disseminated by . . . means of public communication . . . if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." W.D.PA.LR 83.1(A). In addition, the Rule prohibits attorneys from making public statements about a number of subjects, including: the defendant's prior criminal record or reputation, the existence of a confession, the identity of prospective witnesses, the possibility of a guilty plea, or the merits of the case. W.D.PA.LR 83.1(C)(1)-(6). The Pretrial Order also required the government to turn over materials relevant to the impeachment of anticipated government witnesses.

---

[1] At an earlier stage the government raised some objections that are not relevant to this appeal; the defense apparently did not raise any objections during the drafting process.

In addition, it provided an aggressive schedule and set of deadlines for pretrial motions and discovery.

On April 6, 2006—about two and a half months after the filing of the indictment—the District Court granted a request by the government, submitted earlier that day, for leave to file a motion under seal. The request did not state the substance or subject matter of the underlying motion. The following morning, Wecht filed a motion to suppress evidence. The motion alleged, in part, that Agent Orsini had falsified material parts of his search warrant affidavits and that he generally had a poor reputation for truthfulness within the FBI.[2] Shortly thereafter, the government, having obtained the District Court's permission the previous day, filed a motion under seal seeking an *ex parte* ruling on whether the government must provide defense counsel with certain personnel records of Agent Orsini. At a status conference, Jerry McDevitt, lead counsel for Wecht, asked how he was supposed to respond to the motion filed under seal, and the District Court replied, "[y]ou are not." JA 262. Later that same day, the District Court issued a sealed order requiring the government to provide copies of the Orsini records to Wecht but allowing it to first move for a protective order "after consultation with counsel for defendant." JA 67.

On April 21, the government provided Wecht with a preliminary list of about 1350 exhibits. The exhibits consisted of more than 240,000 pages in an electronic database.[3] Wecht Pet. at 31. Wecht's counsel believed that this submission did not comply with the Pretrial Order, which required the government to provide

---

[2] The motion to suppress stated that "Counsel for Dr. Wecht represents, by way of proffer, that they have repeatedly interviewed a witness with personal knowledge of Orsini's reputation and tactics and who was personally asked by him to lie during a Department of Justice investigation into his misconduct." JA 157 n.7.

[3] Apparently, the government provided additional exhibits in the following days bringing the total number of pages to 300,000.

6

exhibits it "intend[ed]" to use at trial. App. 44. In addition, Wecht's counsel asserted that it would not be possible to review all the documents in the time allotted by the Pretrial Order. At a conference held on April 28, the District Court determined that the government had complied with the Pretrial Order and expressed his hope that the parties would work together productively on a joint exhibit list.

On May 3, 2006—about four weeks after the Court had ordered the government to provide Wecht with the Orsini records—the government filed a motion for a protective order prohibiting public disclosure of the records. Wecht filed a response on May 10 objecting to the proposed protective order. On May 12, two newspapers (the Pittsburgh Post-Gazette and the Pittsburgh Tribune-Review) and two television stations (WPXI and WTAE) moved sucessfully to intervene.[4] Meanwhile, in late April and early May, defense counsel made a number of comments to the press regarding the case, some of which were in response to stories suggesting that the government would charge Wecht with additional tax fraud charges and that one of Wecht's associates had intimidated a witness. The government asked the District Court to address the propriety of these comments to the press in light of the Pretrial Order's limitations.

At a conference on May 12, the Court reminded the parties of the limits placed on their public comments about the case and suggested that either party could move for contempt if either believed opposing counsel violated the Pretrial Order. The Court, however, permitted briefing on whether Local Rule 83.1 imposed unconstitutional prior restraints on speech. The parties also discussed the government's exhibits; defense counsel reiterated that he could not review the materials and make objections by the Pretrial Order's deadline. The Judge then scheduled four days of hearings in early June to go through the exhibits with the parties. Finally, the Judge also set a schedule for the parties to brief whether Orsini's records should be unsealed, and he instructed the

---

[4] The District Court allowed the media companies to participate in the May 12 conference, and formally granted their motions to intervene on May 30.

parties to confer and file a joint proposed protocol for any future sealing of documents. A few days later, while awaiting briefing on the sealing of the Orsini records, the Court issued a protective order prohibiting defendant from reproducing the records or disclosing their contents in open court.

Despite the May 12 conference, problems with the government's exhibits continued. Wecht did not submit specific objections to the exhibits by the Pretrial Order's May 15 deadline. On May 17, the District Court issued an order admitting all of the government's exhibits subject only to relevancy objections that might result from rulings on the motion to suppress or any motion to dismiss. On May 26, Wecht moved for reconsideration of this order, which he now characterizes as a "suspension of the rules of evidence." Wecht Pet. at 28.

On May 31, the District Court denied most elements of Wecht's suppression motion but scheduled a June 8 hearing to address the issue of certain boxes that were seized by the FBI at Wecht's private office. Although Agent Orsini testified at the suppression hearing, McDevitt did not use the personnel records to cross-examine him. McDevitt stated at oral argument that he believed an order of the District Court had prohibited him from doing so. Also on June 8, the Court ruled that Local Rule 83.1 did not violate the First Amendment. Wecht and the media outlets appeal this ruling.

On June 13, the District Court denied the balance of Wecht's motion to suppress as well as his motion to unseal the Orsini personnel documents. The Court, however, granted the media outlets' motion to unseal, finding that "[e]ven though the material is quite likely irrelevant and not admissible at trial, the government has not established a compelling interest or good cause to justify the continual sealing" of it. JA 44. The District Court stayed the order pending the government's appeal.

On June 14, in response to Wecht's motion to reconsider its order admitting all of the government's exhibits, the District Court ruled on specific objections that Wecht had submitted a week earlier. The Court also sharply criticized the defense's failure to comply with pretrial requirements and announced that following

8

the trial he would schedule a hearing to determine whether counsel's actions constituted contempt.

Finally, on June 30, Wecht filed a motion requesting that the Judge recuse himself from the case. The Judge denied the motion, and Wecht now seeks a writ of mandamus ordering the Judge's disqualification.

In short, there are now three applications before us. First, Wecht challenges the constitutionality of Local Rule 83.1 and its limitations on attorney speech about ongoing cases. Second, the government appeals the District Court's decision granting the media outlets' motion to unseal the Orsini records. Third, Wecht petitions for an order disqualifying the District Court Judge.

We have jurisdiction under 28 U.S.C. § 1291 to review Wecht's appeal regarding the constitutionality of Local Rule 83.1 and the government's appeal of the unsealing order. In regard to Wecht's petition for disqualification of the Judge, we have jurisdiction to issue writs of mandamus under 28 U.S.C. § 1651(a). For the reasons that follow, we will vacate the District Court's decision as to Local Rule 83.1, though for different reasons than argued; affirm the District Court's unsealing order; and deny Wecht's petition to disqualify the trial judge.

## II. DISCUSSION

### A. Local Rule 83.1

As previously mentioned, shortly after Wecht's indictment, the government and defense counsel agreed to the terms of a Pretrial Order that incorporated the provisions of Western District of Pennsylvania Local Rule 83.1. The Rule states:

> It is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by (for dissemination by any) means of public communication, in connection with pending or imminent criminal litigation with which he/she or the firm is associated, if there is a reasonable

9

likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

W.D.PA.LR 83.1(A). In addition, the Rule prohibits attorneys from making public statements about a number of subjects:

1. The prior criminal record (including arrests, indictments, or other charges of crime), or the character or reputation of the accused, except that the lawyer or law firm may make a factual statement of the accused's name, age, residence, occupation, and family status, and if the accused has not been apprehended, a lawyer associated with the prosecution may release any information necessary to aid in his/her apprehension or to warn the public of any dangers he/she may present;

2. The existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement;

3. The performance of any examinations or tests or the accused's refusal or failure to submit to an examination or test;

4. The identity, testimony or credibility of prospective witnesses, except that the lawyer or law firm may announce the identity of the victim if the announcement is not otherwise prohibited by law;

5. The possibility of a plea of guilty to the offense charged or a lesser offense;

6. Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

W.D.PA.LR 83.1(C).

10

About two months after entry of the Pretrial Order, the government notified the District Court about statements that Wecht's attorneys made to the press. For example, regarding the possibility of a superseding indictment, lead counsel Jerry McDevitt told a television station that "[i]f you ever lived on a farm, you know that if you take a bunch of cow manure and you put it on an existing pile of cow manure, all it does is make a bigger smell." Wecht Br. at 19. And Mark Rush, another of Wecht's attorneys, commented to a newspaper that "when [Agent Orsini's] truthfulness is put to issue, those search warrants will fall." JA 277. The government requested that the Court "address this matter" at the upcoming status conference "by reminding counsel of the provisions of the [Pretrial Order] and enforcing those provisions." JA 278.

At the conference, the Court reminded the parties of their obligations under the Pretrial Order and suggested that either party could move for contempt if either believed opposing counsel was violating the order. McDevitt argued that the Rule was unconstitutional, and the parties, including the media outlets, subsequently submitted briefs on the issue. The District Court determined that the Rule struck "a wise and permissible balance between the rights of all parties to a fair trial, by an untainted jury, and the rights of attorneys to speak to the media." JA 37. On appeal, Wecht and the media contend that the Rule violates the First Amendment by imposing overly broad restrictions on speech.

In addition to defending the constitutionality of the Rule, the government argues that Wecht and his counsel have waived any First Amendment claims because they agreed to the proposed Pretrial Order. The government contends that this waiver also precludes the media companies from asserting third-party standing. The media outlets, by contrast, assert that they have third-party standing to bring First Amendment claims on behalf of the public, irrespective of Wecht's possible waiver. They claim that the public has a strong interest in hearing counsel's views about criminal cases, particularly high-profile prosecutions such as this one, and they note that it is well-established that the First Amendment protects potential recipients of speech as well as speakers. See, e.g., Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes

11

a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both.") (footnote omitted).

### 1. Third-Party Standing

We previously addressed the standing of third parties to challenge gag orders in FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834 (3d Cir. 1996).[5] There, we noted that "putative recipients of speech usually have standing to challenge orders silencing would-be speakers," but that "plaintiffs still must show that the gag orders have caused them injury in fact and that their injury is likely to be redressed by a favorable decision." Id. at 838. Accordingly, we held that "third parties have standing to challenge a gag order only when there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so." Id. at 838-39.

The government contends that Wecht's attorneys cannot be "willing" speakers because they agreed to include the language of Local Rule 83.1 in the Pretrial Order. This argument however, misconstrues the purpose of the "willing speaker" rule as well as the requirements for standing. We have previously determined that media outlets have "standing to challenge protective orders and confidentiality orders" as long as they can demonstrate that the order is an obstacle to their attempt to obtain access. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 777 (3d Cir. 1994). In Pansy, we held that intervenor newspapers had standing to challenge a confidentiality order over a settlement agreement. Because the newspapers might have gained access to the settlement agreement through the common law right of access or the Pennsylvania Right to Know Act, it did not matter that the litigants in the underlying matter had not objected to the confidentiality order when it was entered.

---

[5] We exercise plenary review over standing issues. Biener v. Calio, 361 F.3d 206, 210 (3d Cir. 2004). Although Local Rule 83.1 may not be a "gag order" as that term is typically used, the same third-party standing principles apply.

12

Physical documents like the settlement agreement in <u>Pansy</u> are, of course, not the same as speech that may or may not be uttered. Unlike obtaining redress through access to existing documents, the only way a third party challenging a gag order can show that it will receive the information it seeks is by demonstrating that there is a willing speaker. The purpose of the "willing speaker" requirement, therefore, is not to tie the third party's interests to those of the speaker, but to ensure that there is an injury in fact that would be redressed by a favorable decision. Here, it is undisputed that Wecht's attorneys are willing to speak about the case and that Local Rule 83.1 limits their ability to do so. To the extent that an occasion arises in the future where defense counsel desires to make public statements about the case, we believe the media and public have a legitimate interest in those comments not being inhibited by overly restrictive limitations.

Accordingly, we hold that the consent of the parties to an order limiting speech is irrelevant to third-party standing analysis as long as the third party can demonstrate that an individual subject to the order would speak more freely if the order is lifted or modified. That Wecht's attorneys consented to a Pretrial Order incorporating Local Rule 83.1 is of no consequence as long as the media outlets can show that counsel want to speak about the case and believe that the Rule limits their ability to do so. The media outlets have satisfied this requirement and have standing to challenge the constitutionality of Local Rule 83.1.[6]

Contrary to the government's assertions, we believe that cases decided by other courts of appeals support our holding. <u>See, e.g</u>, <u>In re Dow Jones & Co.</u>, 842 F.2d 603, 605-08 (2d Cir. 1988) (holding that parties consenting to a gag order can nevertheless be willing speakers). The government cites <u>Public Citizen v. Liggett Group, Inc.</u>, 858 F.2d 775 (1st Cir. 1988), in which a group of public health organizations represented by Public Citizen sought access to discovery materials produced by a tobacco company. The government focuses on the Court's observation that plaintiffs in the underlying case had "opposed the protective order at every stage."

---

[6] We need not reach the question of whether Wecht also has standing since he raises the same arguments as the media.

Id. at 787 n.12. The government ignores, however, that this statement was made to support the conclusion that "[b]ecause obtaining a modification of the protective order will, as a practical matter, guarantee Public Citizen access to documents in the plaintiffs' possession, Public Citizen has standing to seek the modification." Id. Employing similar reasoning to reach the opposite result, the Court in Oklahoma Hospital Ass'n v. Oklahoma Publishing Co., 748 F.2d 1421 (10th Cir. 1984), denied a publishing company standing because it was unlikely it "would succeed in obtaining the redress it seeks—access to the documents—were [the Court] to lift the protective orders." Id. at 1425.[7] We read these cases as supporting our conclusion that the standing inquiry should focus on whether third parties would obtain the information they seek if successful on the merits of their claims.

### 2. Modification of the Local Rule

Having determined that the media outlets have standing, we next address the substance of their challenge. In Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991), the Supreme Court determined that a local rule prohibiting attorney speech that had a "substantial likelihood of material prejudice" on a criminal trial did not violate the First Amendment. Id. at 1063. The media outlets assert that Local Rule 83.1 is unconstitutional because it prohibits comments that have a "reasonable likelihood of prejudice," a standard that the Supreme Court in Gentile described as being "less protective of lawyer speech" than the one it upheld. Id. at 1068. The media outlets also argue that Section C of the Rule

---

[7] The government also cites American Library Association v. Odom, 818 F.2d 81 (D.C. Cir. 1987), in which researchers sought access to documents housed in a library. The Court applied a "willing speaker" test and determined that there was not "a solid basis on which to conclude that plaintiffs' interests and the Library's . . . [were] congruent," and that the Library had "not been shown to be a willing communicator." Id. at 87. We read Odom as relying upon the researchers' failure to demonstrate that they would gain access to the documents even if successful on the merits of their claim.

14

impermissibly creates prohibitions on all speech concerning issues such as the defendant's prior criminal record or reputation, the existence of a confession, the identity of prospective witnesses, the possibility of a guilty plea, and the merits of the case. The government, on the other hand, contends that the reasonable likelihood standard satisfies the First Amendment's requirements. See In re Morrissey, 168 F.3d 134 (4th Cir. 1999).[8] In addition, the government suggests a limiting construction, under which comments about the subjects in Section C are only considered presumptively prejudicial.

We find it unnecessary to address the parties' constitutional arguments. Instead, we choose to invoke our supervisory authority over the application of a local rule of practice and procedure. As the Supreme Court has noted, courts of appeals are authorized to "mandate 'procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution.'" Thomas v. Arn, 474 U.S. 140, 146-47 (1985) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)); see also United States v. Bazzano, 712 F.2d 826, 843 (3d Cir. 1983) ("[T]here is no doubt that this Court has supervisory power to promulgate rules of practice and procedure for the better administration of the judicial process."). We have invoked this supervisory power in a variety of contexts. See, e.g., United States v. Eastern Med. Billing, Inc., 230 F.3d 600, 607-12 (3d Cir. 2000) (discussing our invocation of supervisory power to prohibit certain jury instructions); Ryan v. Butera, Beausang, Cohen & Brennan, 193 F.3d 210, 214 (3d Cir. 1999) (exercising supervisory power over attorney-client fee arrangements); Dunbar v. Triangle Lumber & Supply Co., 816 F.2d 126, 129 (3d Cir. 1987) (invoking supervisory authority and mandating certain pleading and notice requirements when parties seek dismissal based on counsel's

---

[8] The government asserts the Second Circuit upheld a reasonable likelihood standard in United States v. Cutler, 58 F.3d 825 (2d Cir. 1995). The Court, however, did not address the constitutionality of the standard. At the outset of its discussion, the Court held that because defendant had not taken previous steps to appeal the relevant order, he could not now argue the restraints were unconstitutional. See id. at 832-33.

apparent default).

Accordingly, we now exercise our supervisory authority to require that district courts apply Local Rule 83.1 to prohibit only speech that is substantially likely to materially prejudice ongoing criminal proceedings.[9] Although "our supervisory authority should not be invoked lightly," Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 295 (3d Cir. 1991), we believe it appropriate to do so here for a number of reasons. Perhaps most importantly, both the Supreme Court and this Court have previously approved the "substantial likelihood" standard. As the Supreme Court explained in Gentile, limitations on attorney speech "are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found." 501 U.S. at 1075. The Supreme Court specifically noted that the "substantial likelihood" standard

> is narrowly tailored to achieve those objectives. The regulation of attorneys' speech is limited—it applies only to speech that is substantially likely to have a materially prejudicial effect; it is neutral as to points of view, applying equally to all attorneys participating in a pending case; and it merely postpones the attorneys' comments until after the

---

[9] This holding applies to the local rules of all the district courts in our Circuit. Presently, Local Rule of Criminal Procedure 53.1 in the Eastern District of Pennsylvania and Local Rule 83.2 in the Middle District of Pennsylvania contain "reasonable likelihood" standards. The District of New Jersey, in Local Rule of Criminal Procedure 101.1, already sets out a "substantial likelihood of material prejudice" standard, as does the District of the Virgin Islands, where Local Rule of Criminal Procedure 1.2 incorporates Local Rule of Civil Procedure 83.2 which adopts the ABA's Model Rules of Professional Conduct. The District of Delaware appears not to have a local rule governing attorney communications in criminal cases, though a Local Rule of Civil Procedure 83.6(d)(2) does adopt the ABA's Model Rules of Professional Conduct for civil proceedings.

trial. While supported by the substantial state interest in preventing prejudice to an adjudicative proceeding by those who have a duty to protect its integrity, the Rule is limited on its face to preventing only speech having a substantial likelihood of materially prejudicing that proceeding.

Id. at 1076. Although we have not had occasion to address the constitutionality of a more restrictive rule, we have stated that the substantial likelihood standard "fairly balances the integrity of the justice system with attorneys' constitutional rights." United States v. Scarfo, 263 F.3d 80, 93 (3d Cir. 2001).

In addition, the substantial likelihood standard is consistent with the ABA Model Rules of Professional Conduct and the ABA Standards for Criminal Justice. See Model Rules of Prof'l Conduct R. 3.6 (2002); Standards for Crim. Justice 8-1.1 (3d ed. 1992). The ABA adopted a reasonable likelihood standard in 1968, but amended its recommendations over the years in response to developments in the law.[10] In the wake of the ABA's Model Rules and the Gentile decision, every state,[11] as well as a majority of

_____

[10] According to the District Court, Local Rule 83.1 has remained the same since it was first adopted in 1971 without any objections from attorneys or the public.

[11] Forty-five states currently apply a "substantially likely to materially prejudice" standard, including each of the eleven states identified by the Gentile Court as having a reasonable likelihood standard at the time. Of the five states that do not, two apply similar standards: Maine prohibits speech that "poses a substantial danger of interference with the administration of justice," Me. Bar R. 3.7(j); Virginia prohibits communications that "will have a substantial likelihood of interfering with the fairness of the trial by a jury," Va. Sup. Ct. R. 6:2-3.6(a).

The three other states apply standards that appear to be even more protective of attorney speech. Illinois prohibits speech that "would pose a serious and imminent threat to the fairness of an adjudicative proceeding." Ill. Sup. Ct. R. Prof'l Conduct 3.6. New

17

federal district courts,[12] now apply rules that are more protective of speech than the reasonable likelihood standard. Moreover, the changes we impose on the federal courts in Pennsylvania will make their rules on trial publicity consistent with the rules of the commonwealth of Pennsylvania[13] and other district courts in our circuit. Among other benefits, lawyers practicing in multiple jurisdictions will now be subject to the same standards.[14]

---

Mexico prohibits statements that are "false; or [that] create[] a clear and present danger of prejudicing the proceeding." N.M. R. Prof. Conduct 16-306. And in Oklahoma, lawyers are prohibited from making public statements that "will have an imminent and materially prejudicial effect on the fact-finding process in an adjudicatory proceeding relating to the matter and involving lay fact-finders or the possibility of incarceration." Okla. R. Prof'l Conduct 3.6.

[12] Our research discloses that of the ninety-four federal district courts, there are forty-nine that, either through their own local rules or by adopting state or ABA rules, apply standards that are more protective of speech. Of these, forty-three apply substantial likelihood standards, while six prohibit comments that would pose a serious and imminent/immediate threat or clear and present danger to the administration of justice. Thirty-six district courts, including the three in Pennsylvania, apply reasonable likelihood standards or rules that are less protective of speech. Seven districts have only some categorical restrictions on speech, and two districts appear not to have a rule addressing trial publicity.

[13] Pennsylvania Rule of Professional Conduct 3.6 largely adopts the language of the ABA Model Rule, as do rules of professional conduct in New Jersey and Delaware. N.J. Ct. R. Prof'l Conduct 3.6; Del. Ct. R., Lawyers' R. Prof'l Conduct 3.6.

[14] We also note that the government stated at oral argument that it "would have no objection whatsoever" to a substantial likelihood standard, only that it did not believe we should declare a rule unconstitutional without good reason. Oral Arg. Tr. 35, Sept. 12, 2006 ("Tr.").

Finally, we note that neither party defends the categorical restrictions of Section C. Consistent with the ABA Model Rule and the rules in most jurisdictions, we will read Section C to provide attorneys with examples of subjects that are likely to be materially prejudicial if spoken about.

## B. Unsealing the Orsini Records

Our judicial process is generally an open one that permits the public to attend trials and view judicial records. This openness "promotes public confidence in the judicial system," "diminishes possibilities for injustice, incompetence, perjury, and fraud," and "provide[s] the public with a more complete understanding of the judicial system." Littlejohn v. BIC Corp., 851 F.2d 673, 678 (3d Cir. 1988). Under certain limited circumstances, however, courts may restrict or altogether close judicial processes to the public.

In this case, the District Court allowed the government to submit a motion under seal regarding its potential obligations under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).[15] Specifically, the government sought permission to withhold from the defense certain personnel records of Agent Orsini. The District Court issued a sealed order requiring the government to provide copies of the Orsini records to Wecht but allowing it first to move for a protective order "after consultation with counsel for defendant." JA 67. Discussions between the parties proved fruitless and the government subsequently moved for a protective order prohibiting public disclosure of the Orsini records. Despite Wecht's objections, the Court granted the protective order while also setting a briefing schedule to allow the parties to address the issue of whether the documents should be unsealed.

---

[15] Brady held that the government must turn over exculpatory evidence to defendants, and Giglio held that impeachment evidence falls within the rule expressed in Brady. See Brady, 373 U.S. at 87; Giglio, 405 U.S. at 154. As such, when we refer to Brady materials in this opinion, we include Giglio impeachment evidence.

19

At this time, the media outlets intervened in the case and submitted briefs challenging the sealing. The media companies asserted that the public had a significant interest in information about Agent Orsini, a key figure in the government's investigation and prosecution of Wecht. In addition, the media outlets argued that the public had an interest in the legal process that took place, including the government's application to withhold the documents and the related rulings of the District Court.

The District Court concluded that the government had failed to demonstrate why the documents should remain sealed and that the "integrity of this public proceeding" required that the public have access to the Orsini records. JA 44. In addition to ordering the unsealing of the Orsini records,[16] the Court modified the protective order by eliminating its reference to the records. However, the Court stayed its order to permit the government to appeal.[17] The government now argues that the District Court erred because the public does not have a First Amendment or common law right to access the materials.

The District Court's opinion to unseal the records does not explicitly state on what grounds it based its decision. The Court stated that the government had failed to demonstrate "a compelling interest or good cause to justify the continual sealing," but it did not expressly hold that the public had a First Amendment or common law right to the documents. Id. We believe both (1) that the public has a common law right to the Orsini records, and (2)

---

[16] Although we focus our discussion on the Orsini records which were attached as exhibits to the government's *in camera* motion, our holding applies to the motion papers as well. The District Court explained that the motion summarized the information in the personnel records, and the government has not argued that we should separately continue the seal of its motion if we affirm the unsealing of the records.

[17] The media outlets have appealed the District Court's decision to stay its unsealing order. We do not believe the Court abused its discretion under the standard we established in Republic of Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 656 (3d Cir. 1991).

20

that the decision to unseal the records was appropriate pursuant to the trial court's general discretionary powers.[18]

    1.  <u>The Public's Common Law Right To Access Judicial Documents</u>

We have previously noted that, "[i]t is well-settled that there exists, in both criminal and civil cases, a common law public right of access to judicial proceedings and records." <u>Goldstein v. Forbes (In re Cendant Corp.)</u>, 260 F.3d 183, 192 (3d Cir. 2001); <u>see also</u> <u>United States v. Criden</u>, 648 F.2d 814, 819 (3d Cir. 1981) ("[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.").[19]  We review decisions relating to the common law right of access generally for abuse of discretion, though our review of the legal principles applied is plenary.  <u>See</u> <u>In re Capital Cities/ABC, Inc.</u>, 913 F.2d 89, 92 (3d Cir. 1990); <u>United States v. Smith</u>, 787 F.2d 111, 113 (3d Cir. 1986).

The public's common law right to access judicial records "is

---

[18] In his concurrence, our colleague criticizes the District Court's initial sealing of the records. We do not address this issue because none of the parties challenge the initial sealing on appeal.

[19] The parties also dispute whether the media outlets have a First Amendment right to the Orsini records.  Courts determine whether the public has a qualified First Amendment right to documents by considering first whether the "process ha[s] historically been open to the press and general public," and second, "whether public access plays a significant positive role in the functioning of the particular process in question." <u>Press-Enterprise Co. v. Superior Court of Cal., County of Riverside</u>, 478 U.S. 1, 8 (1986); <u>see also</u> <u>United States v. Smith</u>, 776 F.2d 1104, 1112 (3d Cir. 1985) (explaining that cases such as <u>Press Enterprise</u> apply to judicial documents as well as judicial proceedings).  Because we find that a common law right of access attaches to the Orsini records, we need not engage in the First Amendment analysis.  <u>See</u> <u>Gulf Oil Co. v. Bernard</u>, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."); <u>United States v. Smith</u>, 787 F.2d 111, 113 n.1 (3d Cir. 1986).

not absolute." Littlejohn, 851 F.2d at 678.  Instead, when the right exists, there is a "strong presumption" that the public may view the records.  See, e.g., Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs., 800 F.2d 339, 344 (3d Cir. 1986).  When parties assert that the need for confidentiality outweighs this strong presumption, we trust trial courts to fairly balance the interests at stake.  Here, the government concedes that if a common law right exists, it "has failed to justify precluding the court from disclosing the information."  Resp. & Reply Br. at 27.  Accordingly, the only question before us is whether the public has a common law right to the Orsini records.

In general, the common law right attaches to any document that is considered a "judicial record," which "depends on whether [the] document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings."  Goldstein, 260 F.3d at 192; see also United States v. Martin, 746 F.2d 964, 968 (3d Cir. 1984) ("The common law right of access is not limited to evidence, but rather encompasses all judicial records and documents.  It includes transcripts, evidence, pleadings, and other materials submitted by litigants . . . .") (citation and internal quotation marks omitted).

The government argues, however, that the Orsini records are discovery materials that cannot be subject to the common law right of access.  The government notes that discovery traditionally has been conducted by the parties in private and has not been publically available.  See, e.g., Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 (1984) ("[R]estraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information."); United States v. Smith, 776 F.2d 1104, 1111 (3d Cir. 1985) (holding that "the common law right of access . . . extend[s] to bills of particulars because we think them more properly regarded as supplements to the indictment than as the equivalent of civil discovery"); United States v. Anderson, 799 F.2d 1438, 1441 (11th Cir. 1986) ("Discovery, whether civil or criminal, is essentially a private process because the litigants and the courts assume that the sole purpose of discovery is to assist trial preparation.").

When discovery materials are filed with the trial court, the private nature of discovery comes into conflict with the public's

22

right to access judicial records. We considered such a situation in Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157 (3d Cir. 1993), where a party had attached discovery materials to a motion filed with the court. After discussing the benefits and disadvantages of extending the common law right to such materials, we concluded that "there is a presumptive [common law] right to public access to all material filed in connection with nondiscovery pretrial motions, whether these motions are case dispositive or not, but no such right as to discovery motions and their supporting documents." Id. at 165. In other words, documents filed with the court are generally subject to the common law right of access, unless attached to a discovery motion.

The government argues that the Orsini records fall within the exception we established in Leucadia because they were filed with a motion for *in camera* review. According to the government, Brady materials constitute discovery and the motion for *in camera* review is therefore a discovery motion. The government notes that we have previously referred to materials that must be disclosed as part of the government's constitutional obligations as "discovery materials." United States v. Bocra, 623 F.2d 281, 285 (3d Cir. 1980); see also In re Capital Cities/ABC, Inc., 913 F.2d at 91 (describing "material that was possibly subject to discovery by the defendants under Brady"). And the government is correct that Brady materials are like discovery in that information is shared in preparation for trial through a process that is generally private and does not involve the court.

At the same time, obligations under Brady are governed not by rules of procedure but by the Constitution. See United States v. Kaplan, 554 F.2d 577, 579 (3d Cir. 1977) ("The rule of Brady v. Maryland is founded on the constitutional requirement of a fair trial, binding on both state and federal courts. It is not a rule of discovery."). In addition, Brady materials, unlike civil discovery, are turned over by the government to the defense during its prosecution of alleged criminals on behalf of the public. Although we are guided by our reasoning in Leucadia, we believe that the unique nature of Brady materials prevents us from seamlessly applying the discovery–nondiscovery dichotomy that Leucadia established in the civil context.

The government has argued that we would cripple the *in camera* process for potential Brady materials if we hold that the common law right of access attaches to the Orsini records. We acknowledge that the implications of extending the common law right to documents submitted for *in camera* review "are unclear, and this alone should counsel restraint." Leucadia, 998 F.2d at 165. Nevertheless, we believe that under the particular circumstances of this case, the public does have a common law right to access the Orsini records.

First, the Orsini documents were filed with the motion for *in camera* review which "clearly establishes" them as judicial records. Goldstein, 260 F.3d at 192. Second, the District Court evaluated the potential relevance of the Orsini records and determined that they must be disclosed to the defense as possible impeachment evidence. Public access to judicial determinations "provid[es] the public with a more complete understanding of the judicial system," and "promotes the public perception of fairness." Criden, 675 F.2d at 556 (internal quotation marks omitted); see also Littlejohn, 851 F.2d at 678 ("[T]he bright light cast upon the judicial process by public observation diminishes possibilities for injustice, incompetence, perjury, and fraud."); Hotel Rittenhouse, 800 F.2d at 344 ("The court's . . . action on a motion [is a] matter[] which the public has a right to know about and evaluate.").

Third, the process by which the government investigates and prosecutes its citizens is an important matter of public concern. See Criden, 675 F.2d at 557 (noting that the public has a "vital interest in evaluating the public officials who work in the criminal justice system"). This distinguishes Brady materials from traditional civil discovery between private parties. Fourth, there can be little question that the particular documents at issue here are of significant interest to the public. The records concern the conduct of an FBI official who played a prominent role in a highly publicized investigation of a well-known defendant accused of abusing his public office. While the probative value of the documents is open to debate, they are of at least some relevance to Wecht's repeated assertions that Agent Orsini lacks veracity and that his affidavits in support of the search warrants were "infected with his deliberate and reckless falsehoods." App. 67.

24

Finally, we believe the records were relevant to Wecht's suppression motion. There is little doubt that Wecht would have cited the Orsini records in his papers had he possessed them at the time he filed his suppression motion.[20] Indeed, the suppression motion discussed Orsini's alleged lack of veracity and previous "involve[ment] in improprieties." App. 68. Further, we take McDevitt at his word that he wanted to use the records to impeach Orsini at the suppression hearing, but that he believed the District Court had prohibited him from doing so.[21] In fact, the government was "surprised" that defense counsel did not cross-examine Orsini with the records, Tr. 114, and it concedes that the documents would be publicly available had they been attached to the suppression motion or used at a public hearing. We think it likely that the District Court would have permitted Wecht to use the records, but even a ruling prohibiting their use would have constituted yet another important judicial decision that the public would have had an interest in evaluating. For these reasons, we conclude that the public has a common law right to access the Orsini records.

The government has suggested that allowing public access to Brady documents filed with the trial court for *in camera* review might result in less production of such material by the government going forward. Because we trust that the government will continue to fulfill its constitutional obligations diligently and with an abundance of caution, we find little merit to this argument. In addition, our decision today is based on the particular facts of this

---

[20] The suppression motion was filed after the government's application to file an "underlying motion" under seal but before the filing of the motion for *in camera* review.

[21] Whether McDevitt could have in fact used the documents at the suppression hearing was hotly disputed by the parties at oral argument. The government has asserted that McDevitt did not even attempt to use the records at the suppression hearing. As discussed at greater length below in Section 3.C of this opinion, we believe the source of this controversy stems from confusion about the scope of Wecht's May 26 application to use the records and the Court's June 2 order denying that application.

case. We certainly do not suggest that the common law right attaches when district courts determine that the government need not disclose materials. As one of our sister courts of appeals has noted, "[g]ranting the public access to . . . undiscoverable documents would furnish it with materials that do not bear on the merits of the trial to which the public has a right of access and would, in effect, give the defendant the discovery to which the court has ruled he is not entitled." United States v. Wolfson, 55 F.3d 58, 61 (2d Cir. 1995).

> 2. The Discretion of District Courts To Amend Protective and Sealing Orders

We also believe it would have been proper for the District Court to unseal the records pursuant to its general discretionary powers. Generally, documents filed with a trial court are available for both the opposing party and the public to view. Because the government's motion concerned its obligation to turn over certain materials to the defense, it asked for permission to file its papers under seal. This meant that although the motion would be noted on the docket, the defense and public would not be able to view the filed papers or learn their contents.

The Court ultimately ordered the government to turn over copies of the materials to the defense but allowed it first to move for a protective order; otherwise, Wecht could have disseminated the information to the public. After briefing, the Court issued a protective order prohibiting the defense from reproducing or disseminating the records, or from disclosing their contents in open court. Upon intervention by the media outlets, the Court reconsidered the various interests at stake, and determined that the records should be unsealed and the protective order modified. The District Court determined that there was not "good cause" for keeping the records sealed or for preventing their dissemination. We believe the District Court acted well within its authority, and that it certainly did not abuse its discretion.

Courts may issue protective orders "for good cause" under Rule 16 of the Federal Rules of Criminal Procedure. See also Pansy, 23 F.3d at 786 (noting in the civil context that "it is

26

well-established that a party wishing to obtain an order of protection over discovery material must demonstrate that 'good cause' exists for the order of protection") (quoting Fed. R. Civ. P. 26(c)). "Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." Id. (citation and internal quotation marks omitted). The good cause determination must also balance the public's interest in the information against the injuries that disclosure would cause. Id. at 787-91.

In Cipollone v. Liggett Group, Inc., 785 F.2d 1108 (3d Cir. 1986), we explained that when there is an umbrella protective order "the burden of justifying the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the protective order." Id. at 1122. We later stated in Leucadia that "our reasoning applies with equal force when a non-party moves to intervene in a pending or settled lawsuit for the limited purpose of modifying a protective order and inspecting documents filed under seal." 998 F.2d at 166. Here, once the defense had viewed all the relevant material and the media outlets had intervened, it was proper for the District Court to consider whether there was good cause for continuing the sealing and protective orders. See Pansy, 23 F.3d at 790 ("The appropriate approach in considering motions to modify confidentiality orders is to use the same balancing test that is used in determining whether to grant such orders in the first instance . . . ."). At that stage, the sealing order prevented direct public access to the documents while the protective order prohibited defense counsel from disseminating the information to the public.

District courts should balance the relevant interests irrespective of whether the public has a First Amendment or common law right to the materials. In Pansy, we rejected the argument of intervenor newspapers that the public had a right of access to a settlement agreement the parties had not filed and the district court had not enforced. 23 F.3d at 782-83. But we then considered whether the district court's confidentiality order over the settlement agreement should be vacated or modified

27

"independent of the right of access doctrine." Id. at 783. We remanded on that issue, noting that the party seeking confidentiality must demonstrate good cause and that the district court must balance the interests at stake. Id. at 783-90, 792.

Also, in Leucadia, we refused to extend the common law right of access to civil discovery motions but noted that the Federal Rules of Civil Procedure already provided "a source of law for the normative rules governing public access to discovery materials." 998 F.2d at 165. See also Phillips ex rel. Estates of Byrd v. Gen. Motors Corp., 307 F.3d 1206, 1212 (9th Cir. 2002) ("If . . . the [district] court finds 'good cause' exists to protect this information, then it must determine whether the Los Angeles Times has a right to Exhibit 8 under the common law right of access, a separate and independent basis for obtaining this information."); SEC v. TheStreet.com, 273 F.3d 222, 234 (2d Cir. 2001) (explaining that although there was no public right of access, the district court still "could reasonably conclude, in the exercise of its informed discretion, that . . . the intervention of a media enterprise for the limited purpose of gaining access to the sealed documents required the striking of a new balance between privacy rights and the interest of the general public"). Although the party seeking to prevent disclosure bears the burden of demonstrating good cause, the balancing does not include the "strong presumption" in favor of access that occurs upon a finding of a common law right.[22]

The District Court noted that the records had been analyzed in its various rulings and that concerns had been raised about tainting the jury pool and discouraging the use of *in camera* review. Nevertheless, the Court concluded that the "integrity of this public proceeding" required disclosure of the documents, and that the government had failed to demonstrate "a compelling

---

[22] Some of our previous cases might suggest that the good cause standard should be applied only after a finding that there is a common law right of access. See, e.g., Leucadia, 998 F.2d at 166-67. Although the same interests must be balanced in either context, demonstrating good cause in the absence of a common law right does not require overcoming a strong presumption in favor of public access.

28

interest *or good cause* to justify the continual sealing." JA 44. (emphasis added). Although the District Court could have explained its reasoning more fully, we believe the opinion demonstrates that it sufficiently considered and weighed the relevant interests at stake. Unless the appellant can demonstrate an abuse of discretion, it is not our role to second guess the District's Courts weighing of the competing considerations. See Rhinehart, 467 U.S. at 36 (noting that the trial judge "is in the best position to weigh fairly the competing needs and interests of parties affected by discovery"). Accordingly, we affirm the District Court's decision that good cause did not justify the continuance of the sealing and protective orders.

## C. Petition for Disqualification of the District Court Judge

In June 2006, Wecht filed a motion requesting that the Judge recuse himself from the case. The Judge denied the motion, and Wecht now seeks a writ of mandamus ordering the Judge's disqualification. Wecht contends that the Judge's management of the case, comments to counsel, and rulings demonstrate bias or create the appearance of bias. Specifically, Wecht argues that:

1. The Judge improperly engaged in *ex parte* communications with the government about the Orsini records.

2. The Judge has issued several suspect orders concerning Agent Orsini.

3. The Judge entered an order that "effectively repealed the rules of evidence" and "admitted at one fell swoop over 240,000 pages of prosecution evidence." Wecht Pet. at 2.

4. The Judge has exhibited antagonism towards defense counsel through threats of contempt and personal attacks.

5. The Judge has denied defense motions without sufficient analysis or explanation.

29

6. The Judge improperly reviewed materials that were not offered into evidence at the suppression hearing.

7. The Judge has inappropriately borrowed case management techniques from civil law.

8. The Judge has "prejudged" the case.

Wecht seeks recusal of the District Court Judge under two provisions of the federal recusal statute, 28 U.S.C. § 455(a) and § 455(b)(1). Section 455(a) states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "The test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." In re Kensington Int'l Ltd., 353 F.3d 211, 220 (3d Cir. 2003). Section § 455(b)(1), in relevant part, requires recusal when the Judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." We review the District Court Judge's application of these standards for abuse of discretion. In re Antar, 71 F.3d 97, 101 (3d Cir. 1995).

Wecht cites to a number of judicial rulings and comments made during this case, but he does not assert that there are extrajudicial sources—defined as "source[s] outside of the official proceedings"—requiring the Judge to recuse himself. United States v. Bertoli, 40 F.3d 1384, 1412 (3d Cir. 1994). The Supreme Court stated in Liteky v. United States, 510 U.S. 540 (1994), that "[i]t is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that 'extrajudicial source' is the *only* basis for establishing disqualifying bias or prejudice." Id. at 551. When a party does not cite to extrajudicial sources, the Judge's opinions and remarks must reveal a "deep-seated" or "high degree" of "favoritism or antagonism that would make fair judgment impossible." Id. at 555-56.

Wecht has raised a number of complaints about the Judge's remarks, practices, and rulings. We have grouped Wecht's allegations into five categories and discuss them below in the

following order: the *ex parte* practices of the Judge; the Judge's general management of exhibits and evidentiary objections; rulings concerning Agent Orsini; the Judge's examination of materials after the suppression hearing; and the Judge's antagonism towards defense counsel.

### 1. *Ex Parte* Practice

Wecht first asserts that the District Court Judge improperly engaged in *ex parte* communications with the government about the Orsini records and otherwise inappropriately handled motions regarding the records. It is important at the outset to clarify what these "communications" are. Wecht has not alleged that the Judge met with government attorneys or otherwise discussed matters in the case with them outside the presence of defense counsel. Instead, Wecht complains that the government filed an *ex parte* motion and that the District Court issued an *ex parte* ruling.

Wecht is correct that, in general, *ex parte* proceedings are disfavored. However, there are a number of circumstances where *ex parte* applications to the court are appropriate, and Wecht appears to overlook our previous statements endorsing the *in camera* inspection of materials that may need to be turned over to the defense. We have, for example, stated that "[t]he submission of discovery materials to the court for an *in camera* inspection and decision as to which materials are discoverable is commonly used when the Government's need for preserving confidentiality over the materials must be balanced with the defendant's constitutional right to evidence material to his defense." Bocra, 623 F.2d at 285. And in United States v. Dent, 149 F.3d 180, 191 (3d Cir. 1998), we held that "[t]he district court's *in camera* inspection of [a police officer's] personnel files fully satisfied Brady's due process requirements."

To be fair, much of Wecht's frustration is directed at the process the District Court Judge followed in evaluating and ruling on the Orsini records. Although the government filed its application for permission to submit an "underlying motion" under seal, Wecht was provided with no information about the content of the motion. When defense counsel asked at a status conference the next day how he was to respond to the motion, the Court replied

31

"[y]ou are not." JA 262. Later that day, the Court issued an *ex parte* ruling that appears on the docket as only an order on the government's sealed motion without indicating the disposition. Certainly, the District Court could have provided Wecht with more information about the process without revealing the contents of the documents. But we fail to see any evidence of bias in the Court's failure to provide that information.

Two other facts undercut any suggestion of bias in the Judge's treatment of the Orsini records. First, the Judge rejected the government's argument that it need not turn over the Orsini records to the defense. Wecht argues that because the records were relevant to his April 7 suppression motion, the Judge should have ordered their immediate disclosure instead of allowing the government to move for a protective order. Perhaps the government should have applied for the protective order more quickly or the Judge should have required it,[23] but defense counsel received the documents in plenty of time to supplement the suppression motion or use the records at the June 8 suppression hearing.[24] Defense counsel would not have been able to use the information in their initial April 7 motion even had the Judge ordered immediate disclosure.

Second, the Judge discussed at some length the *ex parte* and sealing process with the parties at the May 12 status conference. The Judge listened to defense counsel's complaint that the "cursory descriptions" of motions to seal on the docket provided insufficient information. The Judge encouraged the government and the

---

[23] Wecht also faults the Judge for inviting the government to apply for a protective order and for allegedly preordaining that it would be granted. The government's sealed motion, however, requests that the Judge issue a protective order if the government was required to disclose the records. The Judge's April 7 ruling orders the government to consult with defense counsel—presumably in hopes of agreement—and then formally apply for a protective order.

[24] Whether the defense was precluded from using the documents at the suppression hearing is a separate issue that we discuss below.

defense to confer and come up with an agreed upon protocol for sealing motions going forward. Later in the hearing, the Judge listened to the arguments of the media and expressed his willingness to improve the process. On May 17, the Judge issued an order establishing a new protocol that accounted for all of the parties' concerns. For these reasons, we discern no bias in how the Judge handled the government's motion regarding the Orsini records.[25]

## 2. Management of Exhibits and Objections

Wecht's complaints about the Judge's management of exhibits stem from the March 1 Pretrial Order, which included schedules and deadlines for pretrial motions and discovery. Section 3(c) ordered the government to provide defendant with exhibits "it intend[ed] to use at trial" by April 21, while defense counsel was to "preliminarily designate" its exhibits by May 5. JA 48. Counsel were to meet on or before May 11 "in an effort to agree upon the admissibility of joint exhibits," and jointly provide the Court with an exhibit binder and chart indicating objections to exhibits by May 15. JA 49. The Court would then address the objections at or before conferences scheduled for June 7 and 8. Id. Both the government and the defense participated in the drafting of

---

[25] We do not disagree with the dissent that the submission of potential Brady materials for *in camera* review along with papers advocating the government's position may present trial judges with a one-sided view. See, e.g., Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987) (noting that *in camera* review of materials can help ensure a fair trial even though it may deny the defendant "the benefits of an 'advocate's eye'"); United States v. Dupuy, 760 F.2d 1492, 1501 (9th Cir. 1985) (noting that a "prosecutor satisfied her duty to disclose exculpatory material" when she submitted certain notes to the trial judge and "discussed with him the reasons to keep the notes confidential"). This appeal, however, does not require us to address whether the government's submission was appropriate. Instead, we are only presented with the question of whether the *in camera* review in this case reveals bias, or creates an appearance of bias, on the part of the District Court, and we do not believe it does.

33

the Pretrial Order and it was adopted with no objections from defendant.

Problems arose, however, on April 21 when the government provided a preliminary list of more than 1350 exhibits. The exhibits comprised more than 240,000 pages of documents in an electronic database. This was apparently far in excess of what the defense had anticipated. According to Wecht, about 300,000 pages of documents had been provided in the course of discovery, and the government had previously estimated that "probably 5 percent" of the exhibits would eventually be offered at trial. App. 731.

The government acknowledged that what they provided on April 21 was "a preliminary exhibit list." Gov. App. 165. Wecht believed this did not comply with the Pretrial Order which required that the government provide exhibits it "intend[ed] to use at trial." At an April 28 conference, the Judge stated that the government's production was appropriate and that he expected the parties to "sit down together" and draft the necessary summaries and stipulations of fact to significantly narrow the number of exhibits. Gov. App. 175.

In addition to the dispute over the government's compliance with the Pretrial Order, there was (and continues to be) fundamental disagreement about how long it should have taken defense counsel to review the government's exhibits. Defense counsel stated that its firm was printing out each of the exhibits and that it would be impossible to review them in the time allotted. The Court, as well as the government, wondered why printing these documents was necessary when it had been agreed that the exhibits should be scanned and provided in electronic form. Further, because the Judge personally reviewed each of the exhibits in the database, he did not credit defense counsel's statements that printing was required. While we are not in a position to resolve this dispute, we do note that more effective communication between defense counsel and the Judge might have yielded a resolution acceptable to all parties. Instead, it appears no one offered sensible suggestions as to how the Pretrial Order could be modified without affecting the trial date.

On May 11, the government and defense met to discuss the

exhibits but the meeting did not last long and accomplished little. At the May 12 conference, defense counsel described the government's exhibits as a "mess" and explained that Wecht would reserve objections until he understood "the basis for the [g]overnment's proffer on all of these documents." App. 763. The Judge expressed his displeasure with the failure of the parties to agree on joint exhibits and stated that, if necessary, he would go through each of the exhibits in court. He then scheduled four days of hearings in early June for this purpose and stated "I do think this is the time for the [g]overnment to decide really which are the exhibits and which aren't." Gov. App. 194-95.

On May 15, the government submitted an exhibit list to the Court, including each of its more than 1350 exhibits, and noted that the defense had objected to all of them. The government also indicated that it consented to the admission of five of Wecht's exhibits, but set forth specific objections to thirty others. The defense did not submit any materials or specific objections to the Court, nor did they seek an extension of time to do so. It is possible, however, that defense counsel believed the discussion at the May 12 conference meant the May 15 deadline no longer applied. Immediately after counsel stated that he reserved objections until he understood the basis for each exhibit, the Court stated: "Okay, fine. We will do it here in court one by one . . . ." App. 763. But after the May 15 deadline passed, the Judge explained that all along he had still expected defense counsel to submit specific objections to exhibits by May 15. The Judge planned to use the exhibit chart to examine objections and make initial rulings, leaving for the June hearings only those exhibits he had questions about.

Though it is possible that defense counsel willfully violated the Pretrial Order, we believe it more likely that there was confusion following the May 12 conference. It appears the Judge and counsel did not communicate effectively about the exact process that was to take place regarding the government's exhibits. While defense counsel should have sought clarification of that process at the May 12 conference or subsequently in writing, the Judge should have more clearly expressed his expectations in light of the scheduling of four days of hearings in June.

35

At a minimum, we believe the Court should have sought an explanation from defense counsel for missing the May 15 deadline before issuing what appeared to be a drastic order on May 17. In that order, the Court stated that because it had not received "specific objection[s]" from defendant, all of the government's exhibits were "admitted into evidence, subject only to possible relevancy objections . . . which may result solely from future rulings on the Motion to Suppress or any Motion to Dismiss." App. 232 (citation omitted). Wecht moved for reconsideration of this order and later for modification of the Pretrial Order. On June 14, the Judge issued an opinion that did not grant these motions, but that ruled on specific evidentiary objections submitted by Wecht one week before.[26] Wecht has characterized the May 17 order as a "suspension of the rules of evidence."

Frankly, we think it was improper for the Judge to admit thousands of pages of materials wholesale into evidence, especially when the government had acknowledged that its list of exhibits was preliminary. If this was not the Judge's intention, he should have subsequently modified his order to clarify its scope. We believe his evidentiary order created unnecessary argument and confusion instead of advancing the goals of the pretrial order to move the case swiftly and fairly toward trial. Nevertheless, his subsequent rulings on objections make clear that he did not in fact suspend the rules of evidence.

It is important to note that district courts have wide discretion in the management of their cases. See, e.g., Yakowicz v. Pennsylvania, 683 F.2d 778, 784 (3d Cir. 1982) (referring to the "broad powers with respect to timing and other considerations that [the district court] has generally in the management of the cases before it as they proceed through the various stages before and during trial"); Titus v. Mercedes Benz of North Am., 695 F.2d 746, 751 (3d Cir. 1982) ("[B]road discretion should be accorded district courts in the management of their calendars."). Further, "opinions formed by the judge on the basis of facts introduced or events

---

[26] Citing to a number of comments in the June 14 opinion, Wecht claims his motion to reconsider "only drew the court's ire." Wecht Pet. at 33. We examine these complaints below in subsection 5.

36

occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky, 510 U.S. at 555. While we are somewhat puzzled by some of the District Court's actions in managing exhibits, we do not believe they display bias, much less the degree of favoritism or antagonism that is required for recusal.[27]

### 3. Rulings and Orders

Wecht has also alleged that a number of rulings in this case demonstrate bias on the part of the District Court Judge. We note at the outset that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . . [They] can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal." Liteky, 510 U.S. at 555. We will not discuss each of the rulings Wecht cites other than to note that they are not grounds for recusal.

However, because the ability of defense counsel to use the Orsini records at the suppression hearing has been the source of such fundamental disagreement, we do believe it merits some discussion. This dispute was particularly evident at oral argument where defense counsel stated that the government was "utterly disingenuous" in suggesting that the documents could have been used at the suppression hearing. Tr. 125. On May 26, defense counsel requested permission to file a sealed motion indicating which statements from the records they would like to use in future

---

[27] Wecht also asserts that the District Court's use of innovative case management techniques borrowed from civil law violates his right to due process. We agree with our dissenting colleague that trial judges managing criminal cases must take into account constitutional and other safeguards that are not at issue in civil matters. Wecht, of course, may later appeal any rulings that he believes violated his rights, but he has failed to explain how the District Court's use of civil management techniques demonstrates any bias.

37

proceedings relevant to "pending motions, including the right of access issues raised by the media as well as the suppression hearing." JA 371-72. The District Court denied the motion on June 2 stating that "to grant said motion would disclose at the very argument certain information in [the Orsini records] relating to the issue of whether [the records] should be unsealed." JA 93.

At the time of the Court's ruling, there were two hearings pending: the June 5 argument on whether the Orsini records should be unsealed and the June 8 suppression hearing. The language of the June 2 order suggests that the Court was addressing only the first of these hearings; the Judge logically believed it made no sense to unseal portions of the records when that was the exact question before him on June 5. Defense counsel, by contrast, interpreted this order as preventing him from using the records at the suppression hearing as well. Although the Court's lack of specificity presumably created this confusion, defense counsel should have sought clarification either before the suppression hearing or at sidebar during it.

4. Examination of Box 20

On May 31, the District Court denied much of Wecht's suppression motion but scheduled a hearing for June 8 to address the seizure of boxes at Wecht's private office, including "Box 20." Wecht argued that the only issue was whether this box's label, "Wecht Law Firm," placed it outside the scope of the warrant. The Judge apparently reviewed the box's contents after the hearing without defendant's knowledge. Wecht asserts that the Judge's examination of the box's contents not only creates an appearance of bias under § 455(a), but also constitutes "personal knowledge of disputed evidentiary facts concerning the proceeding" under § 455(b)(1).

The District Court apparently had access to the contents of the box when the government provided the Court with the electronic database of exhibits on May 15. Wecht may be right that the label on the box, and not its contents, is the only relevant issue when determining whether the agents acted within the scope of the warrant. Perhaps the Judge should have made clear that he intended to review the actual contents of the box in order to

38

provide defense counsel an opportunity to comment. Wecht may have grounds upon which to appeal the Judge's ruling on his suppression motion, but there is no evidence the Judge was biased. Nor do we believe the Judge's actions create an appearance of bias.

Furthermore, we do not believe the Judge's review of the box's contents requires recusal under § 455(b)(1) because, as the government notes, the Judge's knowledge was not "personal" in nature. The documents had been presented as exhibits and were available to all parties at the time the Judge reviewed them. In other words, the Judge's knowledge about the documents did not derive from a source outside the proceedings.

5. Antagonism Toward Defense Counsel

*a. Threats of Contempt*

Wecht's claim that the Judge has "threaten[ed] counsel with criminal contempt on five occasions" distorts the record. Wecht Pet. at 47. In particular, Wecht first cites to the Judge's discussion of Local Rule 83.1 in his June 8 opinion, but there is no mention of contempt other than in the Judge's description of the facts of another case. Wecht also cites to the May 12 conference where the Judge stated that "if any counsel believes the opposing counsel is violating the order of the Court and/or the local rule, they should file a motion to have the opposing counsel adjudged in civil contempt and I will hold a hearing." App. 771. We do not believe it is fair to characterize this as a threat of contempt and certainly not as a threat directed at a particular party.

Nevertheless, the Judge did announce in his June 14 opinion that there would be a hearing after the trial to determine if defense counsel's violations of the Pretrial Order constitute contempt.[28] In

---

[28] The other two examples cited by defendant also concern the same violations of the Pretrial Order. In a May 17 order, the Judge stated that a future hearing would determine if defense counsel had acted in good faith when meeting with the government on May 11 to discuss exhibits. Wecht's final example, which certainly cannot be characterized as a threat, is the Judge's July 20 recusal opinion in which he states that defense counsel would have

39

his recusal opinion, the Judge specified that defense counsel had violated the order by failing to (1) meaningfully confer with the government on May 11 about exhibits; (2) work with the government on a trial exhibit list; (3) file objections to exhibits by May 15; (4) prepare properly for the June 7 conference; and (5) make good faith objections.[29]

Defense counsel does not believe they violated the Pretrial Order and they assert that any missed deadlines were caused by the voluminous exhibits provided by the government. However, the dispute over whether violations occurred, or if those violations rise to the level of contempt, is not one for us to resolve at the moment. As the District Court noted, defense counsel may appeal any future adverse contempt rulings. For now, we simply note that the District Court's actions with respect to contempt do not exhibit the level of bias necessary for recusal. Certainly, we do not approve of the practice of scheduling contempt proceedings in the midst of a hard fought case without immediately resolving the issue. It is possible that the shadow of such punishment may chill the zealous advocacy of defense counsel. But the circumstances surrounding the threat of contempt in this case does not "display a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky, 510 U.S. at 555. Our view might be different if contempt had been mentioned in a wide variety of contexts or in response to, for example, good faith motions in the defense of a client. Here, however, the possible violations are limited to the handling of exhibits and related deadlines in the Pretrial Order. We do not believe this merits recusal.

### b. Antagonistic Comments

Defense counsel also asserts that the Judge has made a

---

the opportunity to appeal any adverse contempt ruling.

[29] In the June 14 order, it was not clear which alleged violations the Court had in mind because the Court cites to a Fourth Circuit case that involved an attorney found to be in contempt for making statements in violation of a local rule that mirrors Local Rule 83.1. The recusal opinion, however, clarifies the District Court's views on the matter.

number of inappropriate statements attacking them. According to Wecht, these include: quoting from the defense firm's website to suggest that counsel were fully capable of reviewing the government's exhibits in the time provided by the schedule; criticizing defense counsel for filing dispositive motions earlier than required; stating that constitutional challenges to the public corruption charges were "without merit"; accusing defense counsel of impugning Senior District Judge Maurice Cohill; and referring to defense counsel's arguments concerning Stephen Zappala as "breathless accusations." Wecht Pet. at 48-50.

The comments Wecht cites do not demonstrate an appearance of bias. The Supreme Court has explained that remarks

> that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. . . . *Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.

Liteky, 510 U.S. at 555-56. We believe Wecht has failed to demonstrate the "high degree of favoritism or antagonism" that is required under Liteky.

The District Court's statements that some of defense counsel's assertions were "without merit" or "breathless accusations" are assessments relevant to the case, whether they are correct or not. The claim that the District Court Judge accused counsel of "impugning Judge Cohill" represents a skewed and unfair reading of the record. In response to Wecht's claim that he demonstrated bias in handling jury questionnaires, the District Court Judge merely explained that he was following the practice of Judge Cohill, "a distinguished jurist," and that he did not believe

41

doing so "constitute[d] bias or lack of impartiality." App. 684.

We also do not credit defense counsel's claim that the Judge "chastised" counsel for filing dispositive motions earlier than required. Wecht Pet. at 48. The District Court Judge was frustrated with defense counsel for not objecting to the government's exhibits in accordance with the schedule in the Pretrial Order, and believed counsel had filed motions in lieu of working on the exhibits.

We find the extensive quoting from defense counsel's website more troublesome. For more than a page in his written opinion, the Judge quoted passages from the website, including a paragraph touting the firm's intellectual property and technology practice, as well as more general promotional statements such as "[o]ur lawyers practice at the peak of our profession." App. 417. While we believe the characterization that defense counsel was being "sarcastically ridicul[ed]" is an overstatement, we do think the passage was inappropriate. See Wecht Pet at 48. Certainly, quoting the website was not necessary to show that defense counsel should have been capable of reviewing the materials in a timely fashion. Nevertheless, we do not believe this reveals a "high degree of . . . antagonism as to make fair judgment impossible." Liteky, 510 U.S. at 555.

Having considered all of the evidence and arguments that Wecht has presented, we do not agree that the Judge should be disqualified. This case has imposed significant burdens on the District Court Judge, who has pursued the important goal of moving the matter swiftly toward trial. In that effort, the Judge has presided over several lengthy status conferences and has ruled on numerous pre-trial motions in an efficient manner. Whether we agree with aspects of the Judge's management of this case is irrelevant to our present inquiry. Wecht simply has failed to demonstrate the "deep-seated" or "high degree" of "favoritism or antagonism that would make fair judgment impossible." Id. at 555-56.

### III. CONCLUSION

For the foregoing reasons, we modify Local Rule 83.1 under

42

our supervisory authority, affirm the District Court's unsealing order and stay of that order, and deny Wecht's petition for mandamus.

BRIGHT, Circuit Judge, concurring in part and dissenting in part:

I concur in Section A of the majority's opinion relating to the gag order and do not address that issue in this opinion.

I concur in Section B of the majority's opinion, but write separately to state my views on the issues of document sealing. This opinion does not address the District Court's decision to stay the unsealing order.

For the reasons stated herein, I respectfully dissent from Section C of the majority's opinion on the question of recusal and would order that this case be reassigned to a new judge.

I. Statement of Facts[30]

Cyril H. Wecht served for many years as the Allegheny County Coroner and as an expert in forensic pathology for numerous private clients, as well as for district attorneys and coroners in other counties. The Government essentially alleges that Wecht used county resources for his private clients, charged his private clients for certain items that were provided to him by the county government, and improperly exchanged unclaimed cadavers with a local college for use of its laboratory facilities for his private work.

Wecht claims that Wecht's indictment arose from a political scheme led by one of his political enemies. He asserts, in part, a defense of selective prosecution. In

---

[30] While this opinion accepts the majority's statement of facts, it restates some of them with additions as necessary to address the issues discussed in this separate opinion.

particular, Wecht asserts that the District Attorney of Allegheny County, Stephen Zappala, and Wecht have been "engaged in a spirited debate caused by Zappala's failure to investigate or prosecute white policemen who had killed black citizens in deaths ruled a species of homicide by Dr. Wecht." Wecht maintains that Zappala publicly called for a federal investigation of Wecht in order to prevent Wecht from publicly inquiring into those deaths. He states that FBI Agent Bradley Orsini led the investigation of Wecht and also the "public corruption" investigations of other Democrats in Pittsburgh. Wecht also maintains that, in aggregate, forty-seven of the eighty-four count indictment relates to no more than $2000 in allegedly fraudulent expense reimbursements.

Pretrial Proceedings

On April 6, 2006, during pre-trial proceedings, the Government filed a motion seeking permission to file "the underlying motion under seal." Although this motion was docketed, there was no "underlying motion" attached to it on the docket. Shortly thereafter, the District Court granted the motion to file the underlying motion under seal, making no findings as to why the document should be sealed. The next morning, at a pre-trial conference, defense counsel pointed out to the District Judge: "The motion that was filed under seal yesterday, we don't even know what it is." The Judge responded, "That's right." Defense counsel inquired further: "So, Your Honor says he is going to rule on the motion. Is it something that affects Dr. Wecht in some way because how are we supposed to respond to the motion?" The Judge replied, "*You are not.*" (Emphasis added.)

The "underlying motion" appears on the docket as filed on April 7, the same day defense counsel was told they would not know its contents. It was filed under seal and described on the docket only as a sealed Government motion. This sealed motion sought an *"ex parte in camera"* ruling as to whether certain materials unfavorable to the affiant, Agent Orsini, on two Wecht search warrants must be disclosed as exculpatory or

-44-

impeachment information under <u>Brady</u> and <u>Giglio</u>.[31] The Government requested, in the alternative, that if disclosure was required, the Court limit the materials' use to only a redacted copy and only if Orsini testified at trial. Also, if disclosure were required, the Government asked for a protective order limiting the use of the materials. The District Court ruled on the Government's motion promptly; in a sealed order, the District Court ordered the Government to turn over the materials to Wecht's counsel. However, the District Judge specifically stated that because the documents constituted <u>Brady/Giglio</u> material, the Government need not disclose the materials until August (as set forth in the Pretrial Order). Because the order was sealed, only the Court and the Government knew its contents.

Contemporaneously on April 7, Wecht filed a motion to suppress certain evidence. In the motion, Wecht challenged the search warrants obtained in this case by Agent Orsini, alleging that Orsini fabricated statements in the probable cause affidavits, the warrants lacked probable cause and were "infected with [Orsini's] deliberate and reckless falsehoods," the warrants were facially defective, and Orsini impermissibly used the warrants as general rights of seizure. Wecht maintained that a witness could testify that Orsini was an agent "with a known bad reputation within the FBI, including having urged witnesses to perjure themselves in a case involving his own misconduct." The motion attempted, in part, to connect the dots between Wecht's claim of selective and vindictive prosecution with Orsini and concerns about Orsini's credibility. Wecht did not learn that the *ex parte* motion and sealed order related to Orsini's credibility until several weeks later.

_____

[31] As the majority notes, in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that the government must turn over exculpatory evidence to defendants. In <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the Court held that impeachment evidence constitutes <u>Brady</u> material.

On May 1, when denying a motion for discovery pertaining to Orsini, the District Court mentioned that it had already ordered the Government to disclose certain Orsini materials under Brady/Giglio. Two days later, on May 3, the Government requested a protective order, covering both the *ex parte* motion and accompanying documents, that would limit defense counsel's use of the documents if ultimately disclosed to them. Defense counsel and various media parties then filed various responses, notices, and briefs advising the Court that it had not made findings necessary for sealing the documents and opposing the Government's proposed protective order.[32] At a May 12 status conference, with the media present, the District Judge responded by entering a protective order and then finally showing only defense counsel the sealed materials. The protective order prohibited defense counsel from, among other things, "disclosing the contents or substance of the Confidential Information in open court absent prior approval of the Court obtained pursuant to a sealed submission or sealed sidebar . . . ." In addition, the District Judge established a briefing schedule for consideration of whether the Orsini documents should be unsealed as to the public and set a hearing on that issue for the next month – June 5, 2006.

In the meantime, on May 17, the District Court admitted all of the Government's approximately 1,300 trial exhibits (which constituted approximately 240,000 pages of documents) without considering any objections from Wecht, thereby eliminating the Government's burden to authenticate or lay a foundation for any of them.[33] The Court left open, however, "possible

_____

[32] The media parties, two newspapers and two television stations, moved to intervene on May 12, filing various motions to be heard on issues and procedures regarding sealing and closure, to unseal the case and records, and to object to the gag order.

[33] Because the majority capably describes the dispute between defense counsel, the Government, and the District

-46-

relevancy objections, which may result solely from future rulings on the Motion to Suppress or a Motion to Dismiss."

In response to the procedures set forth in the protective order, defense counsel filed a motion on May 26, requesting permission to file a motion under seal to determine what portions of the reports they could use in "further proceedings." At the time defense counsel filed this request, the anticipated "further proceedings" were (1) an unsealing hearing scheduled for June 5 and (2) a possible suppression hearing, which had not been scheduled yet because the Court had not ruled on Wecht's motion to suppress, which included a request for a hearing. On May 31, however, the Court denied most of Wecht's suppression motion, including his request for a hearing to establish that Orsini had falsified probable cause affidavits, but scheduled a limited hearing for June 8 with respect to only the seizure of certain "boxes" of documents.

On June 2, the Court denied Wecht's May 26 motion to file a motion under seal in which Wecht would request to use certain statements from the Orsini reports in open court. As of the date the District Court denied the request, the potential "further proceedings" included a June 5 unsealing hearing and a June 8 limited suppression hearing. On June 5, at the unsealing hearing, the District Judge invited supplemental briefing on the unsealing issues, which effectively delayed the unsealing decision until after the suppression hearing on the "boxes" scheduled for June 8, 2006.

On June 13, the Court finally ordered the *ex parte* motion and exhibits (in unredacted form) unsealed, but stayed the order to allow the Government to appeal its decision. Notably, the Court denied the motion for unsealing as to Wecht, pointing out that Wecht failed to demonstrate a basis for unsealing the documents. Then, in

Judge which led to the admission of these exhibits, this opinion does not restate it.

-47-

the same order, the Court granted the motion as to the media interveners, explaining that the Government had "not established a compelling interest or good cause to justify the continued sealing of doc. no. 60." Because of the stay order, the sealed materials have remained undisclosed to the public and not useable by Wecht to this day.

From this series of decisions, the Government appeals the District Court's order unsealing the Orsini documents and Wecht has filed a petition of mandamus seeking recusal of the District Judge. Although the media parties challenge the District Court's decision to stay its unsealing order, this opinion addresses only the Government's appeal and Wecht's petition for recusal.

II. Discussion

If this case illustrates any basic principle of justice, it is that secrecy and the right of the defendant and the public to a fair and open trial do not mix except in rare and unusual circumstances not presented by this case.

A. District Court's Unsealing Order

The District Court in this case sealed the *ex parte* motion without making any findings to justify its sealing. This practice was improper and limited Wecht's ability to prepare his defense. The majority in this case affirms the District Court's decision to unseal the Orsini documents in part because the District Judge possessed the discretionary authority to unseal the documents or amend its previously issued orders. I agree that this Court should affirm the District Court's decision to unseal the documents. I write separately, however, to assert that the District Court's initial sealing of the documents rested on improper procedures and resulted in a "too little, too late" outcome.

The District Judge's sealing of the *ex parte* motion and accompanying documents without any findings

-48-

shifted the legal burden for sealing. The burden to justify sealing a document or for entry of a protective order is on the party seeking its sealing or protection, not, as imposed in this case, on the defendant. See Leucadia, Inc. v. Applied Extrusion Techs., Inc., 998 F.2d 157, 167 (3d Cir. 1993). When a court considers the imposition of a seal, it must make particularized findings on the record, giving notice on the docket of such consideration and rejecting alternatives to closure. See United States v. Criden, 675 F.2d 550, 560 (3d Cir. 1982). In this case, the District Court did not make any such findings. The Government merely filed a motion requesting permission to file the underlying motion under seal. No underlying motion was attached and no reasons were given justifying closure. Even the underlying motion did not address justifications for sealing the documents, but concerned whether certain documents constituted Brady/Giglio material. Rather than imposing on the Government the burden to justify sealing the motion, the Court sealed the motion from the outset and then the media and Wecht were forced to spend months briefing the Court as to why the motion should be *un*sealed.

During those intervening months, while the motion and accompanying documents remained sealed, the Court denied Wecht's motion to suppress and his counsel was prevented from using any of the documents at the limited hearing regarding the seizure of the "boxes." The sealed materials about Agent Orsini were relevant and of crucial importance to the suppression motion, which alleged that Orsini had fabricated statements in the probable cause affidavits. Yet the District Judge denied Wecht's request to file a motion under seal to determine which portions of the documents could be used in court and how.[34] Notably,

---

[34] The majority explains that this order cannot be construed to mean that the District Judge restricted defense counsel from using the Orsini documents at the "boxes" suppression hearing because defense counsel could have sought clarification of the Court's "lack of specificity." I disagree. The Court's order indicated that Wecht could not even seek

in its decision unsealing the documents, the District Court explained precisely how the documents had been rendered useless to Wecht:

> Defendant argues that he wishes to have doc. no. 60 unsealed so that he may use the information therein at any hearing on the motion to suppress (doc. no. 55), or at trial, to impeach FBI Agent Orsini . . . However, since defendant's motion to suppress (doc. no. 55) has been denied, the first part of the defendant's argument is moot. . . . Secondly, since the government has indicated that it does not intend to call Special Agent Orsini at trial (see doc. no. 60, page 6), defendant's "for use at trial" argument is also moot at least until such time as the government states that Special Agent Orsini will in fact testify at trial. . . . Thirdly, defendant contends that he intends to call Special Agent Orsini at trial. Since Agent Orsini is not a "fact" witness, the Court does not see the relevancy of his purported testimony, even though counsel for defendant continually seeks to label him as the "main accuser." Thus, defendant's motion to unseal is DENIED.

But, at the time the Government requested permission to submit the *ex parte* motion under seal, these matters had not yet been resolved. The Court relieved the Government of its burden to show good cause as to why the documents should be sealed and then, after the Government had attempted to eliminate the usefulness of the documents by stating Orsini would not be called as a

---

permission *under seal* to use certain statements in court and the protective order remained in full effect. It was not unreasonable for Wecht to understand the order to mean that under no circumstances could he use the documents during the suppression hearing.

witness, the District Judge denied Wecht's requests to unseal them because they lacked useful purpose.

As to the media, the District Judge ultimately determined that the Government had failed to demonstrate good cause to justify the documents' continued sealing. Yet, as demonstrated above, this relief even for the media is too little, too late. Even though the public will gain access to the documents, the time has passed for Wecht to use them to challenge Agent Orsini's testimony in the suppression hearing. The Government thus benefitted by the improper sealing of the documents and Wecht has been deprived of using the information about Agent Orsini contained therein in its suppression motion or at any suppression hearing.

The District Court did not merely have the discretion to unseal the *ex parte* motion and its exhibits, but was obligated under the law to unseal the documents. My concurrence rests on this basis, not on the basis of the District Court's discretion.

### B.  Recusal of the District Judge

Although I concur (separately) in the majority's decision affirming the District Court's unsealing order, I dissent from its opinion with respect to Wecht's petition for mandamus requesting recusal of the District Judge. I dissent to express my opinion that we should remove the District Judge from this case either under 28 U.S.C. § 455(a) or our supervisory powers.

### 1.  The Standard for Recusal

The decision to remove a judge from an ongoing trial should be considered seriously and made only rarely. This Court may order the recusal of a judge pursuant to 28 U.S.C. § 455(a) for the appearance of partiality or reassign the case to a new judge under its supervisory powers. See 28 U.S.C. § 455(a) ("Any justice, judge, or magistrate judge of the United States shall disqualify

himself in any proceeding in which his impartiality might reasonably be questioned."); Liteky v. United States, 510 U.S. 540, 554 (1994) ("Federal appellate courts' ability to assign a case to a different judge on remand rests not on the recusal statutes alone, but on the appellate courts' statutory power to 'require such further proceedings to be had as may be just under the circumstances,' 28 U.S.C. § 2106.").[35]

"The test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." In re Kensington Int'l Ltd., 368 F.3d 289, 301 (3d Cir. 2004); see also Virgin Islands v. Walker, 261 F.3d 370, 376 (3d Cir. 2001) (focusing on appearance of impartiality when reassigning sentencing judge who appeared to have inappropriately considered defendant's decision to plea bargain); Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 164-68 (3d Cir. 1993) (reassigning a case from a judge who appeared to have aligned with the defense); Haines v. Liggett Group, Inc., 975 F.2d 81, 98 (3d Cir. 1992) (exercising supervisory power to reassign judge because it was "impossible for us to vindicate the requirement of 'appearance of impartiality' in view of the statements made in the district court's prologue to its opinion"). Significantly, appearance alone is sufficient to warrant relief on mandamus because "'while review after final judgment can (at a cost) cure the harm to a litigant, it cannot cure the additional, separable harm to public confidence that section 455 is designed to prevent.'" See Alexander, 10 F.3d at 163 (quoting In re School Asbestos Litig., 977 F.2d 764, 776 (3d Cir. 1992)). In addition, the "appearance of impropriety must be viewed from the perspective of the objective, reasonable layperson." Kensington, 368 F.3d at 303.

---

[35] Defense counsel, all experienced attorneys, state that among them none have previously brought a motion to recuse a federal judge. They appear to have done so here only with reluctance and careful consideration.

In Liteky, the Supreme Court explained that although an extrajudicial source may be a practical necessity for establishing prejudice or bias, it is only a factor. *See* 510 U.S. at 554-56. Without an extrajudicial source, the judge must reveal deep seated or a high degree of antagonism to evince bias. See id. at 555-56. As the majority notes, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion" because "[i]n and of themselves . . . they cannot possibly show reliance upon an extrajudicial source." Id. at 555.

The circumstances of this case present the rare occasion when a judge's judicial rulings demonstrate the appearance of bias because they began with and were possibly tainted by improper, or at least highly questionable, *ex parte* advocacy by the Government. This *ex parte* advocacy was tantamount to an extrajudicial source and permeated the rulings of the District Court such that one cannot avoid discerning the appearance of partiality.

2. *Ex Parte* Advocacy

As set forth previously, on April 6, the Government filed a motion with the Court requesting permission to file the "underlying motion" under seal. The underlying motion appeared on the docket as filed on April 7 and remains sealed from the public. The *ex parte* motion was entitled "*In Camera Ex Parte* Motion for Ruling As To Whether Possible 'Impeachment/Credibility' Information Must Be Disclosed." The Government filed it under seal, and, as previously observed, without the Court having made any findings for good cause to seal the motion.

The Code of Conduct for United States Judges prohibits *ex parte* communications except in certain circumstances not presented by this case. See Code of Conduct for U.S. Judges Cannon 3 § A(4) (2003). As this Court stated in Kensington,

> *ex parte* communications run contrary to our
> adversarial trial system. The adversary

-53-

process plays an indispensable role in our system of justice because a debate between adversaries is often essential to the truth-seeking function of trials. . . . If judges engage in *ex parte* conversations with the parties or outside experts, the adversary process is not allowed to function properly and there is an increased risk of an incorrect result.

268 F.3d at 310. Although the *ex parte* communication in Wecht's case was not a verbal conversation, as in Kensington, a motion presents the same concerns for the adversarial process because counsel's assertions remained unchecked by opposing counsel. Moreover, as in a verbal conversation, the Government and the District Judge exchanged and conveyed information to one another. In these ways, *ex parte* communications, including *ex parte* advocacy, can function as an extrajudicial source. Cf. Kensington, 368 F.3d at 308 n.18, 310 (noting that *ex parte* conversations with experts constitute extrajudicial knowledge).

The *ex parte* motion constituted advocacy.[36] It spans nine typed pages and also attaches both unredacted and proposed redacted versions of "reprimand reports" relating, in part, to Agent Orsini's reputation for truthfulness. The Government devotes more than a page of the motion to the accomplishments and accolades previously earned by Orsini, including numerous awards he has received and high profile cases he has investigated. Then the Government briefly describes the contents of the reprimand reports that concern Agent Orsini and downplays their significance. The Government next recites certain "facts" of the case.

---

[36] While the effect of this Court's opinion on the unsealing order will be to unseal these documents, this opinion does not herein reveal the contents of the *ex parte* motion or its exhibits except generally or as necessary for explanation. This opinion also does not disclose the specific contents of the reprimand reports, which were attached to the *ex parte* motion.

-54-

The Government argues to this Court that its motion was not *ex parte* communications, but rather a benign *ex parte* filing:

> The government simply filed one (1) document *in camera* (after providing defense counsel with notice of its intention to do so) in order to ensure its compliance with its Brady/Giglio obligations. This single, and completely appropriate, *in camera* written filing hardly supports Wecht's accusations that the District Court and the government "engaged in an ex parte practice," . . . .

The Government, however, mischaracterizes the content of its motion. It did not merely submit a document for *in camera* review, but rather, as described above, argued to the Court why the materials were not covered by Brady/Giglio. The motion set forth facts about Orsini not already in evidence, explained the Government's intention to limit Orsini's role in the trial, characterized Orsini's role in the investigation, cited case law and made arguments as to why Brady/Giglio did not require disclosure of the documents.

Wecht knew the existence of a motion, but was unaware of its subject matter and was told by the Court that he would remain so. Under these circumstances, the Government's motion remained untested by the adversarial process. Moreover, as in Kensington, the *ex parte* motion concerned not merely procedural matters, but went to the very heart of the proceeding. See id. at 310. Brady disclosures, after all, are matters of constitutional significance. See Brady v. Maryland, 373 U.S. 83, 86 (1963).

It is helpful to refer to a portion of the *ex parte* motion's content in order to illustrate how the Government's motion went beyond a mere *in camera* submission to the Court. For example, the Government represented to the District Court in the *ex parte* motion that Agent Orsini "was one of the case agents involved in

the investigation," the Government did not intend to call Orsini to testify at trial, and "Special Agent Orsini was the affiant on two search warrants that resulted in the seizure of evidence, but the evidence seized with those warrants will be introduced by other witnesses *actually involved in the creation, chain of custody, and maintenance of that evidence*." (Emphasis added and internal footnote omitted).

Wecht's counsel would and could have contested these "facts" as presented by the Government.[37] Wecht's defense rests, in part, on selective prosecution and he maintains that Orsini was not merely "one of the agents," but the lead investigator who was influenced by Stephen Zappala to investigate him. Moreover, the Government's *ex parte* motion attempts to diminish Orsini's role in the handling and chain of custody of the evidence. At the suppression hearing on the "boxes," however, the "other agents" to whom the Government may have been referring presented testimony that they turned over the evidence to Orsini after it was seized and deferred to Orsini's directions during the seizure as to the scope of the warrants. Agent Welsh testified that he twice called Agent Orsini during the search to clarify and narrow the search parameters, seeking advice as to how to know which "boxes" to seize. Agent Welsh also testified that it was Orsini who instructed that "box 20" be seized, although later clarifying that it was a collective decision. Agent Swim testified that he signed over the evidence, once seized, to Agent Orsini.

The Government contends that the District Court Judge's ruling in favor of Wecht on the Government's motion undercuts any suggestion of bias. Yet the District Court's ruling, whether for or against the Government, cannot overcome that the Government explained to the Court its strategy to keep Orsini off the witness stand, without giving Wecht a chance to listen or respond.

---

[37] This opinion does not suggest that the Government misrepresented facts to the District Court, but notes these factual inconsistencies to illustrate how the Government's motion needed the adversary process.

-56-

Through its advocacy, the Government disclosed to the Court that Orsini had credibility problems and it planned to limit his presence at trial. The Government also indicated its desire to delay disclosure of the Orsini materials until trial and even then, disclose them only if Orsini testified at trial. Despite the Court's ruling in favor of Wecht as to whether the materials constituted Brady/Giglio materials, the Court relied on the advocacy within the motion. Notably, when explaining why the documents would be of no use to Wecht in its ultimate unsealing order, the District Court *cited* to document 60. Even this small citation reinforces the way in which the *ex parte* advocacy may have influenced the District Judge, as it indicates that he relied on it when making subsequent decisions.

The Government sought to protect the Orsini materials with two alternative requests: (1) that the Orsini materials would never be disclosed or, (2) if required to disclose the documents, only with redaction and under a protective order, and only if Orsini testified at trial. The Government also represented to the District Court that the documents would not be useful to Wecht because it did not plan to call Orsini to testify at trial, notwithstanding that Orsini appears to be the lead FBI agent investigating Wecht's case. The Court, despite ordering the documents to be turned over to Wecht, *followed* the requests of the Government in the *ex parte* motion by entering a series of rulings that made the documents unavailable or unuseable up until the present time.

The Government and the majority also downplay the appearance of partiality created by the *ex parte* motion by citing to cases such as United States v. Dent, 149 F.3d 180, 191 (3d Cir. 1998) and United States v. Bocra, 623 F.2d 281, 285 (3d Cir. 1980), which would appear to condone the practice of *in camera* review. These cases, however, bear two important distinctions from the case at hand. First, although the Court in Dent and Bocra reviewed potential Brady materials *in camera*, there is no indication that either party engaged in *ex parte* advocacy in those cases, as the Government did in this case. See Dent, 149 F.3d at 191; Bocra, 623 F.2d at 284-86. In

-57-

addition, in both Bocra and Dent, defense counsel was at least aware that an *in camera* inspection of potential Brady materials was taking place, which was not the case here.[38] See Dent, 149 F.3d at 191; Bocra, 623 F.2d at 284-86.  The Government should be careful to distinguish *in camera* review from *ex parte* motion practice.[39]

### 3.  Other Rulings

Considering all of the above, the *ex parte* motion submitted to the District Court closely resembles an extrajudicial source that heightens the appearance of bias in Wecht's case so far.  But, just as consideration of an extrajudicial source does not require recusal, see Liteky, 510 U.S. at 554-55, neither should consideration of *ex parte* communications.  Alone, the Court's consideration

---

[38]  Moreover, this Court's determinations in the Bocra and Dent cases concern whether, *on a post-conviction basis*, these practices satisfied the requirements of Brady.  That is not the issue before this Court; this opinion rather evaluates whether this *ex parte* practice contributed to the appearance of bias in Wecht's case.

[39]  Other cases cited by the Government similarly fail to support its *ex parte* motion practice in this case.  In United States v. Hsu, 155 F.3d 189 (3d Cir. 1998), this Court remanded an action to permit the District Court to undertake *in camera* review of certain documents to determine whether they had been properly redacted.  See id. at 205-06.  In the Lindh case in the Western District of Virginia, the District Court appears to have undertaken *ex parte in camera* review of potential Brady materials.  See United States v. Lindh, 2002 WL 1974284, *1 (E.D. Va. 2002).  However, in the Lindh case, it also appears from an earlier, similar review of materials that the government followed the practice of submitting an application to the court requesting permission to make an *ex parte in camera* motion, providing the defense notice and an opportunity to respond, prior to actually doing so.  See United States v. Lindh, 198 F. Supp. 2d 739 (E.D. Va. 2005); see also Joint Appendix at 728-41.  In neither the Hsu case nor the Lindh case did a court endorse the practice of submitting nine pages of advocacy that remained unchecked or unknown by opposing counsel in connection with *in camera* review of Brady/Giglio materials.

of *ex parte* advocacy likely would not evince bias sufficient to warrant relief for Wecht. Yet the District Court's consideration of the *ex parte* motion created a backdrop against which its future rulings appear, in substance and in timing, questionable.

In Alexander, this Court explained that we need not decide the merits of each allegation against the judge; rather, the "appropriate–and the only–inquiry to which we must respond is 'whether a reasonable person, knowing all the acknowledged circumstances, might question the district court judge's continued impartiality.'" 10 F.3d at 164 (citation omitted). Thus, without determining or evaluating the merits of the District Court's rulings, this opinion examines the picture the District Judge painted in his courtroom and asks whether a layperson, given all the facts, would reasonably believe Wecht was receiving an impartial trial.

a) April 7 Sealed Order. In the sealed order requiring the Government to turn over the Orsini materials to the defense, the District Judge reminded the Government that Brady/Giglio materials could be withheld until August (as set forth in the Pretrial Order). *Brady* does not require early disclosure, see United States v. Kaplan, 554 F.2d 577, 580 (3d Cir. 1977), but this Court has explained that it is *preferable* for *Brady* materials to be disclosed well in advance of trial. See, e.g., United States v. Starusko, 729 F.2d 256, 261, 264 (3d Cir. 1984) (describing "longstanding policy of encouraging early production"); Kaplan, 554 F.2d at 581 ("[W]e disapprove and discourage a practice of delayed production of Brady materials."). Given such precedent and admonition, that Wecht had filed a motion to suppress raising the very concerns about Agent Orsini that the yet-undisclosed materials addressed, and that the Government's *ex parte* motion explained its desire to delay disclosure of the materials, an informed layperson would reasonably ask: Why would the District Judge suggest such a delay to the Government?

b) Admission of Evidence. On May 17, 2006, the Court admitted all of the Government's approximately 1,300 trial exhibits without considering any objections

from Wecht and eliminating the Government's burden to authenticate or lay a foundation for them.[40] The Court left open, however, "possible relevancy objections, which may result solely from future rulings on the Motion to Suppress or a Motion to Dismiss." The District Judge's ruling, at this point, effectively eliminated the Government's evidentiary burdens on foundation and potentially reduced Orsini's role in the case. The only remaining avenue for Wecht to challenge Orsini's involvement and conduct in handling the evidence was the motion to suppress. Thus, subject to the pending motion to suppress, the Government would no longer need Orsini to lay the foundation for any of the evidence. An informed layperson would reasonably ask: Why would the District Judge admit approximately 240,000 pages of documents, without foundation, as trial exhibits?

The majority appears to agree that the Court acted improperly in its treatment of the trial exhibits, but declines to infer an appearance of bias because the District Judge ultimately cured his mistake by considering the objections. However, the Court finally considered Wecht's objections to the Government's exhibits after rejecting numerous pleas from defense counsel to reconsider his order or modify the pretrial order. Also, the District Judge's ultimate consideration of Wecht's objections to the exhibits failed to undo the damage done. This so-called cure led to the admission of numerous documents as *trial exhibits* that appear to have no good use at trial. Wecht's counsel included in his petition a list of items that have now been admitted as trial exhibits. Some of these items include photocopies of blank compact disc covers, a brochure for a nursing home litigation seminar, and multiple handwritten notes with no identifying features. An informed layperson would reasonably ask: Does the Government sincerely intend to use all of these documents as *trial exhibits*?

---

[40] As explained in the fact section above, because the majority capably describes the dispute between defense counsel, the Government, and the District Judge which led to the admission of these exhibits, this opinion does not re-summarize it here; the decision's *effect* is the relevant consideration.

The Court, while supposedly reviewing an average of 34,000 documents a day, seems to have overruled virtually all of Wecht's objections as to relevance, hearsay, authentication, foundation, and chain of custody – qualifying the documents as business records, government records, or personal records. The Court stated: "Interestingly, defense counsel's 'good faith objections' even challenge the 'foundation' and 'chain on [sic] custody' of defendant's own records, including personal tax returns, corporate tax returns, and corporate general/profit loss ledgers . . . . Countless other business records of Dr. Wecht are objected to on the basis of 'Relevance (FRE 402); Hearsay (FRE 802); Authentication (FRE 901); Foundation; and Chain of Custody.'" Perhaps Wecht's objections could have been more specific, but the Court's comment expresses exasperation with defense counsel for asking the Court to require the Government to establish the basic features of admissibility provided under the Federal Rules of Evidence.

The documents to which the Court refers may indeed constitute business records; however, it is the Government's burden, as the proponent of the evidence, to provide the foundational elements that show each document qualifies for the business record exception to the hearsay rule under FRE 803(6). Wecht is under no obligation to stipulate to those features.

It is a hallmark of partiality for one party not to be put to its burden. The admission of this evidence without foundation testimony appears to have advanced the Government's stated goal of keeping Orsini off the witness stand. Although the Government may have intended to call witnesses other than Orsini to lay the foundation for its exhibits, in any event, the District Judge's wholesale admission of evidence precluded the Government from *having* to call Orsini for such purpose. An informed layperson would reasonably ask: Why did the Court obviate, even upon re-consideration, the Government's burden to lay the foundation for evidence it

intended to use at trial?[41]

       c) <u>June 2 Denial of Request to File Motion Under Seal</u>.  In response to the procedures set forth in the protective order, on May 26, Wecht filed a request to file a motion under seal.  If permitted to file the motion, Wecht intended to request to use certain statements from the Orsini reports in open court.  The Court denied Wecht's request in a docket text order on June 2.  Presumably, the District Judge considered Wecht's request premature because a hearing on whether the documents would be unsealed was only three days away.  Naturally, if the Court unsealed the documents at that hearing, the request would be moot.  Conversely, it would have been inappropriate to discuss, in open court, the contents of sealed documents in the context of a hearing on whether to maintain the seal.

       Yet the Government did not oppose the motion and the Court did not advise defense counsel that it would reconsider the motion if the documents remained sealed after June 5.  Then, on June 5, at the unsealing hearing, the District Judge invited supplemental briefing on the unsealing issues, which effectively delayed the unsealing decision until after the "boxes" suppression hearing scheduled for June 8, 2006.  Now, Wecht's May 26

---

    [41]  In his memorandum of opinion denying reconsideration of admission of the Government's trial exhibits, the District Judge describes his reliance on <u>The Elements of Case Management: A Pocket Guide for Judges</u> (2006) and <u>Manual for Complex Litigation</u> (4th ed.) (2006).  These texts do not apply to criminal trials.  The <u>Manual</u> specifically states: "because civil and criminal case management differ significantly . . . this edition only deals with *civil litigation*."  <u>Manual</u>, <u>supra</u> at 2 (emphasis added).  Similarly, the <u>Pocket Guide</u> describes itself as a "pithy guide to the essential steps in managing a *civil case*."  <u>Pocket Guide</u>, <u>supra</u> at v (emphasis added).  The rules pertaining to case management of complex civil litigation do not apply to criminal trials for which the Constitution and case law provide safeguards for a fair trial.  While there is a necessity for organization and efficiency in any trial, those interests must be balanced against the rights of a criminal defendant: a man's liberty is at stake.

motion was no longer moot because the Court's ruling on the unsealing motion would occur *after* the suppression hearing. Rather than hearing out defense counsel, who might have been able to clarify its intended use of the reports (whether or not they would ultimately remain sealed or unsealed), the District Judge denied defense counsel's request to even make a motion under seal. Hearing such motion might have clarified Wecht's intended use of the documents at not only the unsealing hearing, but also the suppression hearing.

An informed layperson would reasonably ask: Why, if the protective order set forth procedures for requesting permission to use the sealed documents (which Wecht followed, and the Government did not oppose), did the Court deny Wecht's counsel the opportunity even to ask, under seal, how it might use the contents of the documents? Such a layperson also would reasonably ask: Why, at the very time when the documents arguably are most relevant, would the Court restrict Wecht from even asking how he might use them?

d) <u>Limited Suppression Hearing</u>. At the suppression hearing on the boxes, Agent Welsh testified that he telephoned Agent Orsini, who was elsewhere, during the seizure to clarify the scope of the seizure and to assist in determining whether to take "box 20." On cross examination, counsel for Wecht then attempted to ask Agent Welsh how well he knew Agent Orsini. Counsel for the Government objected and the Court sustained the objection for relevancy. Later, the District Judge asked Agent Swim and counsel for the Government whether someone was going to testify as to the chain of custody of the boxes to "clarify that issue." Counsel for the Government responded that he had not envisioned that as an issue for the hearing, but that the agents could testify about chain of custody. Agent Swim then testified that he gave Agent Orsini the evidence after seizing it, which would put Orsini directly in the chain of custody.

Agent Orsini was scheduled to testify at the suppression hearing sometime after Agent Swim. Although Orsini testified at the suppression hearing, Wecht was precluded from challenging his credibility

-63-

with the Orsini documents because of the strictures of the protective order in place.

After a recess, the District Judge changed his mind and decided to exclude chain of custody from the scope of the hearing. Certainly a trial judge has the discretion to limit examinations to a relevant scope and may change his mind as to that scope, but, an informed layperson would reasonably ask (in light of the Government's statements in its *ex parte* motion that "other witnesses" (other than Orsini) were "actually involved in the creation, chain of custody, and maintenance of [the] evidence"): Was the District Judge attempting to further the Government's goal not to use Orsini for foundation or chain of custody when he curtailed chain of custody testimony?

e) June 13 Unsealing Order. On June 13, the Court finally ordered the *ex parte* motion and Orsini documents unsealed, but in an unusual order. First, the Court denied the motion for unsealing as to Wecht, pointing out that Wecht failed to demonstrate a basis for unsealing the documents. Then, in the same ruling, the Court granted the motion as to the media interveners, explaining that the Government had "not established a compelling interest or good cause to justify the continued sealing of doc. no. 60." As to Wecht, the Court placed the burden on him to justify unsealing the documents, but as to the media, the Court placed the burden on the Government.

This is a strange and unsettling ruling as to Wecht in contrast to the media. If a document is unsealed, it is unsealed to the world. The distinction between unsealing the Orsini materials on a motion by the media, but not Wecht, creates an appearance of hostility, if not partiality. An informed layperson would reasonably ask: Why did the District Court treat the media differently than Wecht?[42]

---

[42] The District Court only showed defense counsel the Orsini documents at a May 12 status conference once the media became involved and in the media's presence. The District Judge had previously indicated that Wecht would not get to know the subject matter of the sealed materials, but changed his mind once in the media's presence. An informed layperson also

f) <u>Review of Box 20</u>.  Wecht argues that the FBI improperly seized "box 20" because the box's label, "Flo-for Wecht law firm,"[43] would have placed it outside the scope of the search warrant.  The "Wecht law firm" refers to Wecht's wife's law firm, which shared office space with the Defendant.  When the District Court concluded that the FBI properly seized "box 20," it cited, in part, to the "plain view doctrine." Neither party, including the Government, argued that the box was lawfully seized pursuant to this doctrine.  The District Court devised this justification for the seizure without briefing or suggestion by either party.

This opinion does not express any conclusion as to the correctness of that decision or the propriety of the seizure, as the parties have not asked this Court to decide whether the District Judge erred in this respect.  Nonetheless, in order to discern whether the District Court's use of the plain view doctrine suggests an appearance of bias, one must, to some extent, consider whether it may have been misapplied.  "Under the plain view exception, law enforcement authorities must have been lawfully on the premises, *the discovery must have been inadvertent,* and *the incriminating nature of the item must have been immediately apparent*." <u>United States v. Scarfo</u>, 685 F.2d 842, 845 (3d Cir. 1982) (emphasis added).  Box 20 was found, lid closed, in a storage room in the shared office space of Wecht and his wife's law office.  The Agents were given specific direction not to seize any items belonging to the Wecht law office.  The Agents testified that the box was a bit unusual in part because it bore a label, "Flo - for the Wecht law Firm" on it.  The Agents testified that they opened the lid of the box and found files pertaining to ongoing or recent Wecht autopsies.  Under these circumstances, it is questionable for the District Court to have concluded that the incriminating nature of the contents of a closed box was immediately apparent.

---

reasonably might have asked on May 12: Why did the District Judge appear to treat the media differently than Wecht?

    [43] "Flo" presumably refers to Flo Johnson, a private assistant for Wecht Pathology.

Moreover, the District Judge acknowledged that he also based his suppression decision on his own *in camera* review of the contents of the box. The question posed to the District Court by Wecht was whether the box was lawfully seized. The Court, without alerting either Wecht or the Government, reviewed contents of the box and determined that they fell within the scope of the warrant. By undertaking a review of the contents of the box, rather than considering the method and manner by which the Government seized the box, the Court deprived Wecht of an opportunity to refute the Court's conclusions about the contents prior to the Court making them. It cannot escape notice that a review of the manner and method of seizure would have included inquiry into the conduct of Agent Orsini, who, by his own testimony, played a key role in the seizure of box 20.

Although a trial judge may properly discern a legal justification in his decisions without prompting by the parties, given the prior context of this case and the possible misapplication of the plain view doctrine, the District Judge's choice enhances suspicions that the Court was favorably disposed to the Government. Given the background, particularly the District Judge's prior admission of the Government's other evidence without consideration of foundation or objections, an informed layperson would reasonably ask: Did the District Court Judge strive to reach a result favorable to the Government?

### 4. Threats of Contempt

Wecht also argues that threats of contempt and antagonistic remarks made by the District Judge contribute to an appearance of bias. "Just as reassignment is necessary if reasonable observers could believe that improper outside contacts influenced a judicial decision, so too is reassignment necessary if reasonable observers could believe that a judicial decision flowed from the judge's animus toward a party rather than from the judge's application of law to fact." Cobell v. Kempthorne, 455 F.3d 317, 332 (D.C. Cir. 2006) (internal citations omitted). Although such expressions of impatience or anger are not alone sufficient to warrant

-66-

recusal, see Liteky, 510 U.S. at 555, in this case they may *contribute* to the overall appearance of partiality considering the other circumstances described above. See Cobell, 455 F.3d at 334 ("But we need not decide whether such charges, standing alone, require reassignment, for the charges do not stand alone.").

Wecht describes two instances in which the District Judge may have threatened his counsel with contempt proceedings. First, on May 12, 2006, the Court stated: "If any counsel believes the opposing counsel is violating the order of the Court and/or the local rule, they should file a motion to have the opposing counsel adjudged in civil contempt and I will hold a hearing." This comment, although on its face applicable to either party, was made in the context of the Government's complaint to the Court about defense counsel's extrajudicial comments. The specter of contempt during that proceeding was *aimed* at defense counsel.[44]

Second, in its memorandum of opinion denying Wecht's motion for reconsideration on the admission of the Government's trial exhibits, the Court stated: "After the trial, the Court will schedule a contempt hearing to adjudicate whether defense counsel's conduct in repeatedly ignoring this Court's Pretrial Order without taking appropriate steps to modify said Order constitutes contempt and, if so, what would be the appropriate penalty." The Court cited In re Morrissey, 168 F.3d 134 (4th Cir. 1999), a case in which the penalty adjudged against counsel was ninety days imprisonment, three years' probation, two years' suspension for "knowingly violating a local rule." See id. at 137.

While it is certainly within the province of a trial judge to require counsel to comply with its orders, repeated threats can create the appearance of bias when

---

[44] Moreover, when defense counsel expressed concerns with the local rule, combined with such "risk of contempt," and their cumulative effect of chilling speech and advocacy, the Court advised defense counsel to "hire a First Amendment lawyer that's an expert in the field to advise you if you are having difficulty understanding it."

-67-

unjustified or can bolster a pre-existing appearance of bias. See Cobell, 455 F.3d at 333-35. While the District Judge's warnings appear harsh in this case, the record is insufficient to determine whether they were improper or contribute to the appearance of bias against Wecht or his counsel.

### 5. Recusal Conclusion

In summary, the materials relating to Orsini constituted Brady/Giglio materials and the Government knew disclosure of the documents would harm its case before a jury and the public. The Government *ex parte* sought to protect this information with two alternative requests: (1) that the Orsini materials would never be disclosed or, (2) if required to disclose them, only under redaction and protective order, and only if Orsini testified at trial. The Government also represented to the District Court that the documents would not be useful to Wecht because it did not plan to call Orsini to testify at trial, notwithstanding that Orsini appears to be the lead FBI agent investigating Wecht's case.

The District Court, without notice or input from Wecht, relied on the *ex parte* representations by the Government and followed the requests of the Government by making the documents unavailable or unuseable up until the present time. Many of the Court's rulings that followed this initial *ex parte* procedure appear to have been made in furtherance of the Government's goal to limit Orsini's connection to the case or, at a minimum, to favor the Government. On this basis, the unbiased observer would reasonably question the District Judge's impartiality.

As noted at the outset of my recusal discussion, this opinion does not suggest that the District Judge harbors actual bias in this case. He is undoubtedly bright, hard working, and has sincerely attempted thus far to administer justice in a highly publicized, hard fought case litigated by experienced counsel. Yet as this Court has stated before, that is not the test for recusal. See Kensington, 368 F.3d at 294. The circumstances of this case, particularly given the content and circumstances of

-68-

the *ex parte* motion, compel the conclusion that a reasonable person, with knowledge of all the facts, would conclude that the District Judge's impartiality might reasonably be questioned.  See id. at 301.

Nonetheless, a judge must be able to rely on counsel for the parties, which have a duty of candor to the court, to inform the judge's decisions.  In this case, the Government's *ex parte* practice appears to have influenced the Court to exclude defense counsel from the adversary process with respect to the Orsini documents.  The chain of motions and proceedings that followed in part flowed from the secrecy surrounding the Orsini documents.  Moreover, the flood of evidence that the Government transferred to the defense, as trial exhibits, and the Government's efforts to keep Orsini's record hidden from the defense and the public raises serious concerns about the propriety of the Government's strategy.  All parties in this case, through their counsel, have an obligation to assist the courts and to see that justice is administered fairly.

In summary, and with reluctance, it is my view that another judge should preside over the trial of Wecht and, therefore, I dissent from the majority.  This Court should grant Wecht's petition for mandamus disqualifying the District Judge from further presiding over the criminal trial of Wecht and authorizing the Chief Judge to assign the case to another judge.